JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 A Hill County jury convicted Brian Hayden Allen (Allen) of two counts of assault with a weapon and one count of criminal endangerment for beating Louis Escobedo (Escobedo) with a pistol and firing the pistol in a residential neighborhood. Allen appeals the conviction, alleging that the District Court committed reversible error by denying his challenge for cause of a prospective juror, denying his motion to suppress recorded telephone conversations, and denying his request for a jury instruction on accomplice testimony. We reverse and remand for a new trial.
¶2 We address the following issues on appeal:
¶3 1. Whether the District Court abused its discretion when it denied Allen’s challenge for cause.
¶4 2. Whether the District Court erred when it denied Allen’s motion to suppress a warrantless recording of a telephone conversation between Allen and a confidential informant.
¶5 3. Whether the District Court abused its discretion when it denied Allen’s request for a jury instruction on accomplice testimony.
FACTUAL AND PROCEDURAL BACKGROUND
¶6 In February 2008 the State charged Allen with four counts of *498 assault with a weapon and one count of criminal endangerment, all felonies. The State later added a count of felony intimidation. According to the supporting affidavit, the charges (save for the first count of assault with a weapon, which was eventually severed and then dismissed) arose from an incident that occurred on the night of January 27, 2008, in Havre, Montana.
¶7 According to the allegations, on that night Allen used a pistol to threaten and then bludgeon (or, “pistol-whip”) Escobedo. The affidavit sketched the following chronology of events. Allen, getting increasingly drunk at the Shanty Bar in Havre, dialed Kristin Golie (Golie) (who was, unbeknownst to Allen, a police informant, working with the local drug task force) to chauffer him to the trailer house where Escobedo was babysitting his nieces. Upon arriving at the trailer house, Allen and Golie somehow (the affidavit glosses over this) drew Escobedo into the backseat of the car. Allen pointed the pistol to Escobedo’s face and demanded money owed to him. Escobedo did not have the money, so Allen struck him repeatedly in the head with the pistol, causing him briefly to lose consciousness. During the fray, Allen fired the pistol, shooting a hole through the car’s rear window. Eventually Escobedo was released, and Allen and Golie returned to the Shanty briefly before retiring to their separate residences for the evening. At numerous points during the incident, Allen also allegedly pointed the gun at Golie and threatened to kill her. At trial Allen testified and admitted to this basic storyline, with two critical exceptions: (1) Allen denied using or discharging a gun during the altercation, and (2) Allen denied ever threatening Golie.
¶8 As mentioned above, Golie was a confidential informant (Cl), and she aided a law enforcement investigation of Allen. As a Cl, Golie surreptitiously recorded her cell phone conversations with Allen. Law enforcement did not obtain a search warrant to record the conversations at issue. Before trial, Allen moved (pursuant to State v. Goetz, 2008 MT 296, 345 Mont. 421, 191 P.3d 489) to suppress these warrantless recordings, arguing that they were obtained in violation of his rights under the Montana Constitution to privacy and to be free from unreasonable searches and seizures. The State opposed the motion, responding that no constitutionally cognizable search had actually occurred because Allen had no expectation of privacy in his cell phone calls. In fact, the State proclaimed that “one can never have an expectation of privacy in a phone conversation,” since existing technology makes it possible for third-parties to eavesdrop on telephone conversations. Further, the State added, society is not *499 willing to recognize as reasonable an expectation of privacy in phone conversations.
¶9 The District Court held a hearing on the motion. Golie and Allen testified. Golie testified that she was a Cl involved in an investigation of Allen and that she recorded calls with Allen at the behest of law enforcement. Golie was usually alone during the calls, but occasionally law enforcement or family and friends were present. During the phone calls, Golie could also hear voices and other sounds in the background, though the only voice she could identify was that of Allen’s wife. Allen in turn testified that he was unaware that Golie was recording their phone conversations and that he believed the conversations were private. Allen never heard other background voices when he spoke with Golie. Allen also testified that his cell phone would alert him if the person on the other end was using the speaker phone and that he could tell by the echo whether someone was listening on an extension line. Thus, he believed he could detect whether any third parties were overhearing his telephone calls. (Although the testimony indicated that numerous calls were recorded, only one of the calls is at issue.)
¶10 The District Court denied Allen’s motion. The court observed that Allen “had a subjective expectation of privacy in the cell phone calls he made to Golie and the calls she made to him.” Nevertheless, the court concluded that society is unwilling to recognize as reasonable an expectation of privacy in telephone conversations. Unlike face-to-face conversations, the court reasoned, a party to a telephone conversation can never be sure who may be listening to the conversation on the other end. The court also noted Golie’s testimony that Allen was apparently in a public setting during portions of his call to her because she could hear voices in the background. Thus, “[wjhether he made the calls or received them from Golie, it was his choice to use the words he did and that left him at risk that someone would hear them or Golie would be recording them.” Accordingly, the court concluded that the State could present the recordings at trial because no search requiring a warrant had occurred.
¶11 The case went to trial in October 2008. During voir dire (jury selection) the parties disputed whether the court should eliminate a prospective juror, Dennis Morgan, on account of his being partial to the prosecution. Upon the prosecutor’s initial inquiry, Morgan declared that he had made up his mind about the case because he had read the newspaper, he considered himself “a law-and-order sort of person,” and he knew the police officers involved in the case both professionally and personally.
*500 ¶12 The prosecutor attempted to rehabilitate Morgan and explained the need for jurors to hear all the evidence before deliberating. She asked, “So if I don’t prove the case are you saying that you’re still going to find him guilty?” Morgan responded that he would not. But under further examination by the prosecution and the defense, Morgan said that he would be “a very impatient juror” if the trial lasted more than two days and that, if it did last more than two days, he would summarily convict Allen to-as the prosecutor put it-“hurry up and get out of here.” Morgan also repeated that he would be “a great juror” for the prosecution, that he was “very law and order,” and that he “kn[ew] all the officers.” When the defense had its turn to question the jurors, Allen’s counsel immediately asked Morgan if he had serious doubts about his ability to be fair in the case. Morgan confirmed that he did.
¶13 Defense counsel then challenged Morgan for cause, asking the court to remove him from the jury pool. The prosecution resisted, “The panelist [h]as indicated that he will listen to the evidence before making his determination and he’s already indicated that he’s not automatically going to find guilt or innocence until then.” The court denied the challenge, explaining, “Mr. Morgan has said that he had some biases towards that, but I don’t think he indicated that he couldn’t be fair and listen to the evidence.” Allen subsequently used a peremptory challenge to remove Morgan from the panel and exhausted his peremptory challenges.
¶14 After the jury was selected, the parties gave opening statements and then presented evidence and testimony. Witnesses called by the State during its case in chief included Escobedo, Golie, the bartender (Jodi Pickens) and a patron (Shane Munyan) at the Shanty Bar on the evening of the assault, one of Allen’s friends (Timothy Vigliotti), and various members of the Havre Police Department. During Golie’s testimony, the State introduced the recorded conversation between Golie and Allen that was the subject of Allen’s motion to suppress. The State’s witnesses described a story that closely paralleled the account from the State’s charging documents-that Allen attacked Escobedo with a gun and threatened Golie. Allen, testifying in his own defense, agreed that he had attacked Escobedo in Golie’s car, while Golie looked on. But Allen steadfastly denied using a gun in the attack and denied threatening Golie at any point.
¶15 Also in dispute was whether Golie was an accomplice to the attack. Golie testified at trial that though she agreed to drive Allen to meet Escobedo, she believed that Allen intended only to acquire narcotics from Escobedo and then go home. Pickens, however, testified *501 that Golie was instigating Allen to “go take care of business at Louis’s.” Allen also testified that Golie knew he intended to assault Escobedo: “She was all for it. Absolutely. She knew exactly what was going on.” Later, on cross-examination Allen was more equivocal, testifying:
She knew the situation. She knew-she didn’t know that that’s why I wanted to go there, because I was mad and I wanted to assault him. She didn’t know that at the time, but she knew I wanted to go to Louis’s.
I called her to come and get me and if he didn’t have my marijuana or my money, I was going to beat him up.
The parties agreed that Golie drove Allen to meet Escobedo and, upon arriving, beckoned Escobedo to approach the car. The witnesses (Allen, Escobedo, and Golie) also testified that Golie immediately began scolding Escobedo for talking to others about her. Escobedo further testified (but Golie denied) that Golie threatened him, saying that “this stuff [talking about her] could get me killed and stuff like that.” After the assault, Golie drove Allen back to the Shanty bar.
¶16 Following presentation of the witnesses, the jury left the courtroom, and the parties and the District Court settled the jury instructions. The only instruction at issue on appeal is “Defendant’s Proposed Instruction No. 3,” regarding the testimony of Golie. The instruction, based on Montana Criminal Jury Instruction 1-112, read:
Testimony has been presented that the witness Kristen Golie may be legally accountable for the offense charged in this case. In this respect, you are to be guided by the following rules of law:
1. A person is legally accountable for the conduct of another when either before or during the commission of an offense with the purpose to promote or facilitate such commission, she solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense.
2. It is a question of fact for the jury to determine from the evidence and from the law as given you by me whether or not in this particular case the witness Kristen Golie is or is not legally accountable within the meaning of the law.
3. The testimony of one legally accountable ought to be viewed with distrust.
4. A conviction cannot be had on the testimony of one legally accountable unless it is corroborated by other evidence which in itself, and without the aid of the testimony of the person legally accountable, tends to connect the Defendant with the commission *502 of the offense or offenses, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
¶17 The District Court questioned the propriety of this instruction, given that there was testimony, in addition to that of Golie, corroborating the charged offenses against Escobedo. The State objected that there was insufficient evidence that Golie was legally accountable (i.e., an accomplice). Ultimately, the court denied the instruction, reasoning that it could confuse the jurors and also that it was improper since Allen had admitted to attacking Escobedo. The court said that Allen was free to challenge the credibility of Golie in his closing argument.
¶18 The parties then presented closing arguments. The State argued that it had met its burden on each count. The defense tried to raise doubts. During its rebuttal, the State referred extensively to incriminating statements made by Allen in the conversation that Golie had secretly recorded. After nearly three hours of deliberation, the jury returned a verdict, convicting Allen of two counts of assault with a weapon for attacking Escobedo and one count of criminal endangerment for firing the pistol in the trailer court. The jury found Allen not guilty of assaulting Golie with a weapon or intimidating her. At a subsequent sentencing hearing, the District Court sentenced Allen to thirty years in prison. The court also awarded restitution to Escobedo and Golie, and recommended myriad conditions in the event Allen is paroled.
¶19 Allen appeals.
STANDARD OF REVIEW
¶20 We review for abuse of discretion a district court’s denial of a challenge for cause of a veniremember (prospective juror). State v. Robinson, 2008 MT 34, ¶ 7, 341 Mont. 300, 177 P.3d 488. “If a district court abuses its discretion in denying a challenge for cause, the defendant uses a peremptory challenge to remove the juror, and also uses all of his peremptory challenges, we will reverse the judgment and order a new trial.” Id.
¶21 We review a district court’s denial of a motion to suppress to determine whether the district court’s findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. State v. Goetz, 2008 MT 296, ¶ 9, 345 Mont. 421, 191 P.3d 489.
¶22 Generally, we review jury instructions in a criminal case to determine if, when taken as a whole, they fully and fairly instruct the *503 jury on the applicable law. State v. Dewitz, 2009 MT 202, ¶ 66, 351 Mont. 182, 212 P.3d 1040. However, under § 26-1-303(4), MCA, it is error for a district court to fail to give an instruction on accomplice testimony when (1) an accomplice gives direct testimony, (2) the defendant requests such an instruction, and (3) the instruction is not inconsistent with the defendant’s claim of innocence. See State v. Hall, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239; State v. Johnson, 257 Mont 157, 163, 848 P.2d 496, 499 (1993).
DISCUSSION
¶23 1. Whether the District Court abused its discretion when it denied Allen’s juror challenge for cause.
¶24 In denying Allen’s challenge for cause, the District Court reasoned that prospective juror Morgan “said that he had some biases towards that, but I don’t think he indicated that he couldn’t be fair and listen to the evidence.” This was based on Morgan’s negative response to the prosecutor’s question whether Morgan would convict Allen if the prosecutor did not prove the case. On appeal the State argues that this was a permissible discretionary determination by the District Court to which we should defer. We disagree.
¶25 In a criminal trial, a party may challenge a prospective juror for “having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party.” Section 46-16-115(2)(j), MCA. This rule is rooted in the fundamental right of criminal defendants to be tried by an impartial jury. State v. Golie, 2006 MT 91, ¶ 29, 332 Mont. 69, 134 P.3d 95; U.S. Const. amend. VI; Mont. Const. art. II, § 24. A district court abuses its discretion if it fails to grant a challenge for cause when a juror’s statements during voir dire raise serious doubts about the juror’s ability to be fair and impartial. Golie, ¶¶ 28, 30; State v. Good, 2002 MT 59, ¶ 53, 309 Mont. 113, 43 P.3d 948; see also State v. Crosley, 2009 MT 126, ¶ 32, 350 Mont. 223, 206 P.3d 932 (citing cases), abrogated in part on other grounds, State v. Robinson, 2010 MT 108, ¶ 12 n. 1, 356 Mont. 282, 232 P.3d 403.
¶26 In reality, few people are entirely impartial regarding criminal matters, and a district court is not required to remove a prospective juror for cause if the juror convincingly affirms his ability to lay aside any misgivings and fairly weigh the evidence. State v. Robinson, 2008 MT 34, ¶ 10, 341 Mont. 300, 177 P.3d 488. Whether a prospective juror can do this is a determination that a district court makes based on the
*504 totality of the circumstances. Id. at ¶ 8. District courts, able to observe the disposition of prospective jurors, are hest placed to make this qualitative determination, for which we grant them a degree of deference. State v. Hart, 2009 MT 268, ¶ 13, 352 Mont. 92, 214 P.3d 1273. To guide district courts in evaluating possible impartiality, we have observed that a prospective juror’s spontaneous and unprompted statements are the most meaningful. State v. Braunreiter, 2008 MT 197, ¶ 9, 344 Mont. 59, 185 P.3d 1024. A district court or litigant may ask open-ended questions to allow a veniremember to clarify initial, suspect statements and thereby allay concerns about impartiality. Robinson, ¶ 11. Conversely, “coaxed recantations” in response to leading questions by counsel “fail to demonstrate” the impartiality required of jurors. Braunreiter, ¶ 11.
¶27 Here, Morgan’s statements during voir dire, viewed as a whole, raised serious doubts about his ability to be fair and impartial. When the prosecutor asked him if he had made up his mind about the case, Morgan responded that he had. Morgan explained that he had read newspaper accounts of the incident, that he was a “law-and-order sort of person,” and that he would be partial to testimony by police officers involved in the case, whom he knew professionally and personally. Morgan’s spontaneous explanation of why he had made up his mind in the case and of why he would be partial carries significant weight. Morgan also expressed an unwillingness to consider all the evidence before reaching a conclusion about the case and eventually agreed with Allen’s counsel that he had serious doubts about his ability to be fair in the case.
¶28 Further, and contrary to the State’s argument, subsequent attempts by the prosecution to rehabilitate Morgan failed to convincingly demonstrate Morgan’s ability to be impartial. After Morgan voiced his initial misgivings about his ability to be impartial, the prosecutor asked, “So if I don’t prove the case are you saying that you’re still going to find him guilty?” And Morgan responded, “No. No, I wouldn’t.” This, the quintessential coaxed recantation, was inadequate to rehabilitate Morgan and show that he could lay aside his bias. In effect, the prosecutor asked Morgan if he would convict Allen without some showing of evidence by the State. Morgan could realistically be expected only to answer this leading question negatively, as he did. See Good, ¶¶ 51, 55 (indicating unlikelihood that prospective juror would challenge judge’s loaded question).
¶29 Morgan’s subsequent statements were more telling. He continued to emphasize his pro-police bias, which he evidently could not set aside *505 (“[I] guess I believe in our law enforcement community.” “[I]’m very law and order.”). The implication of these statements is that Morgan would give disproportionate weight to any law enforcement testimony, to the detriment of any testimony from the defense. Additionally, in response to continued questioning by the prosecutor, Morgan repeatedly displayed a disinclination to consider all the evidence presented. He stated that would be a “very impatient juror if this thing lasts over two days.” Then, after the prosecutor asked him if he would find Allen “guilty because you want to hurry up and get out of here,” Morgan responded, “If it lasts more than two days, yes.” Finally, the prosecutor probed, “You understand that you won’t get to deliberate until we are done with the case?” Morgan, making no concession, replied, “And again, if it lasts more than two days, that’s going to be a problem.” Apparently exasperated, the prosecutor conceded (“Okay. Okay.”) and moved on to other jurors. The prosecutor’s attempts at rehabilitation were to no avail.
¶30 The District Court’s failure to grant Allen’s challenge for cause was an abuse of discretion. Because Allen used a peremptory challenge to remove Morgan and then exhausted his peremptory challenges, we reverse and remand for a new trial. Robinson, ¶ 7.
¶31 Because the remaining issues may arise on retrial, we address them below. State v. Barosik, 2009 MT 260, ¶ 3, 352 Mont. 16, 214 P.3d 776.
¶32 2. Whether the District Court erred when it denied Allen’s motion to suppress a warrantless recording of a telephone conversation between Allen and a confidential informant.
¶33 At trial the State presented the warrantless recording of a phone conversation between Allen and Golie that Golie had recorded at the behest of law enforcement. Allen maintains that this was error and that the recording should have been suppressed.
¶34 The State argues on appeal that under existing precedent, police need not obtain a warrant to record telephone conversations, and consequently, that the District Court properly denied Allen’s motion to suppress. The State further contends that even if the Court reconsiders this precedent, the District Court’s denial of Allen’s motion was still proper because (1) a constitutionally cognizable search did not occur and (2) if one did, no warrant was required in light of Golie’s consent.

A. Evolution of Jurisprudence on Electronic Monitoring by Police

¶35 Initially we must determine whether to revisit our jurisprudence regarding the warrantless electronic monitoring and recording of *506 telephone conversations by law enforcement with the consent of one party (or, “warrantless participant recording”). A line of cases, beginning with State v. Coleman, 189 Mont. 492, 502-03, 616 P.2d 1090, 1096 (1980), and continuing through State v. Jones, 2008 MT 440, ¶¶ 10-12, 347 Mont. 512, 199 P.3d 216, has condoned warrantless participant recording. Allen contends that the seminal case, Coleman, was wrongly decided and should therefore be overruled, along with its progeny. We agree that the reasoning in Coleman was flawed and that, in light of Goetz, we should reassess our jurisprudence on this topic.
¶36 To critique Coleman, we must first examine two earlier cases involving electronic monitoring: State v. Brackman, 178 Mont. 105, 582 P.2d 1216 (1978), overruled, State v. Brown, 232 Mont. 1, 755 P.2d 1364 (1988), overruled in part, Goetz, ¶ 24, and State v. Hanley, 186 Mont. 410, 608 P.2d 104 (1980). In Brackman, police-acting without a warrant-monitored and recorded a face-to-face conversation between the defendant and a police informant in a public parking lot by placing an electronic monitoring device on the informant. Brackman, 178 Mont. at 107, 582 P.2d at 1217. The State subsequently charged the defendant with intimidation. Id. In response to a motion in limine by the defendant, the district court suppressed the taped conversations for having been obtained in violation of the defendant’s constitutional rights. Id. On appeal, we considered whether warrantless participant monitoring and recording violates the United States or Montana Constitutions. Id. at 108, 582 P.2d at 1217.
¶37 We held that under the plurality opinion in United States v. White, 401 U.S. 745, 91 S. Ct. 1122 (1971) (plurality), such surveillance does not violate the United States Constitution. Brackman, 178 Mont. at 117, 582 P.2d at 1222. However, we further concluded that warrantless participant recording of a face-to-face conversation does violate the Montana Constitution. Id. We indicated that the express right to privacy (“Article II, Section 10” or “Section 10”) and the right to be free from unreasonable searches (“Article II, Section 11” or “Section 11”) of the Montana Constitution, read in conjunction, provide greater protection to people in Montana than does the Fourth Amendment of the United States Constitution. Brackman, 178 Mont. at 113-17, 582 P.2d at 1220-22; accord Goetz, ¶ 14; see also U.S. Const. amend. IV; Mont. Const. Art. II, §§ 10-11. We reasoned that effective law enforcement is not hindered by requiring police to obtain a warrant prior to conducting participant recording. Brackman, 178 Mont. at 115-16, 582 P.2d at 1221-22. We also agreed with the reasoning of Justice Harlan’s dissent in White that electronic *507 monitoring of a conversation is a greater invasion of privacy than allowing police to merely use a confidential informant (without a monitoring or recording device) and that, consistent with “the goals and values of our political system,” such surveillance should be subject to warrant requirements, not merely the self-restraint of law enforcement. Id. at 115, 582 P.2d at 1221 (paraphrasing White, 401 U.S. at 785, 91 S. Ct. at 1143 (Harlan, J., dissenting)).
¶38 Two years later we decided Hanley. In that case an undercover police officer-again, acting without a warrant-recorded a telephone call with the defendant and two other parties in which they arranged a drug sale. Hanley, 186 Mont. at 412, 608 P.2d at 105-06. The police then secured a warrant for the undercover officer to electronically monitor and record the actual sale. Id. at 412, 608 P.2d at 106. Following the sale, the defendant was arrested and charged with the criminal sale of dangerous drugs. Id. at 413, 608 P.2d at 106. The defendant moved to suppress the recorded telephone conversation and all other evidence, which he argued was obtained as a result of the telephone recording. Id. The district court denied the defendant’s motion. Id. At trial the district court refused to admit the warrantless recording of the telephone conversation, but allowed the prosecution to admit the recordings of the actual drug sale, as well as the drugs seized. Id. at 413, 417-18, 608 P.2d at 106, 108. After being convicted, the defendant appealed, inter alia, the district court’s denial of his motion to suppress. Id. at 413, 608 P.2d at 106.
¶39 The relevant issue on appeal was whether the district court correctly denied the motion to suppress. Id. at 413, 608 P.2d at 106. We found no error and affirmed. Id. at 422-23, 608 P.2d at 111. In reaching this conclusion, we first rejected the defendant’s argument that the recording of the drug sale (for which the police had obtained a warrant) and the drugs seized were the rotten fruit of an illegal search and therefore inadmissible. Id. at 418, 608 P.2d at 108-09; see also Wong Sung v. United States, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (evidence obtained as direct or indirect result of unconstitutional search is inadmissible). This was because the police relied, not on the warrantless telephone recording, but on the testimony of the undercover agent to obtain the warrant. Id. at 418, 608 P.2d at 108-09. Thus, the undercover agent was an independent source of the information necessary to obtain the warrant, obviating the warrantless telephone recording. Hanley, 186 Mont. at 422, 608 P.2d at 110. For this same reason, we concluded that Brackman (and, thus, analysis under the Montana Constitution) did not apply. Id. at 418, 608 P.2d at
*508 109. Nevertheless, as a nod towardBrackman, we observed that “if the police had relied on the recorded tape of the telephone conversation to obtain evidence against appellant, the argument could be made that such evidence should have been suppressed.” Id. at 418, 608 P.2d at 108.
¶40 The defendant apparently also challenged the legality of the recording of the drug sale (for which the state had a warrant) under federal law (Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522). See Hanley, 186 Mont. at 419, 608 P.2d at 109 (“The next issue raised is whether federal statutes prohibit the monitoring and tape recording of a conversation in which one of the participants consents . . . .”). We rejected the defendant’s challenge, observing that 18 U.S.C. § 2511(2)(c) expressly permits participant recording. Hanley, 186 Mont. at 419-20, 608 P.2d at 109. We further cited the rationale of the plurality in White (though it was not a statutory analysis), which also condoned such police recording. Id. at 420, 608 P.2d at 109. Next (apparently addressing the legality of the recording under the United States Constitution) we obliquely noted that because the defendant “could have no reasonable expectation that the person he was dealing with in this drug-related matter was not in fact an informer,” and because the police had obtained a warrant, in any case, to record the drug sale, “no interest legitimately protected” by the United States Constitution was involved. Id. at 421, 608 P.2d at 110. Finally we added, without explanation, that such monitoring was also permissible under § 45-8-213(l)(c), MCA. Thus, we resolved the issue without addressing the protections of the Montana Constitution.
¶41 That same year we decided Coleman. That decision involved consolidated cases, only the second of which is relevant to the present analysis. In that case, police monitored and recorded a telephone call between the defendant and a consenting CI. Colman, 189 Mont. at 502, 616 P.2d at 1095. This apparently exceeded the scope of the warrant. Id. The defendant was subsequently arrested and convicted of possession of dangerous drugs. Id. at 498, 616 P.2d at 1093. On appeal, the defendant argued that the recording of the telephone conversation violated his right to privacy under the Montana Constitution. Id. at 502, 616 P.2d at 1096. In the space of one paragraph, we rejected this argument on the basis of Hanley-even though Hanley had avoided the question of the legality under the Montana Constitution of warrantless participant monitoring. Id. at 502-03, 616 P.2d at 1096. We interpreted Hanley as holding “that interception of telephone conversations by police officers is legal if one of the parties to the conversation *509 consents.” Id. Next we distinguished Brackman, reasoning that unlike the participants in that case (who conversed face-to-face in an open parking lot), a party to a telephone conversation cannot have a reasonable expectation of privacy because he cannot see the party on the other end and cannot be sure whether the conversation is being overheard. Id. at 502-03, 616 P.2d at 1096. We then abruptly concluded, “Neither the Montana nor the federal constitution prohibits such monitoring where one of the participants consents.” Id. at 503, 616 P.2d at 1096.
¶42 The difficulties with this analysis are apparent, even before considering the subsequent ruling in Goetz. First, the Coleman Court cited (as the State here recognizes) the analysis in Hanley of federal statutes as the controlling analysis under the Montana Constitution. The Coleman Court then repeated this mistake when it cited 18 U.S.C. § 2511(2)(e) to support its conclusion that the Montana Constitution does not prohibit warrantless consensual participant monitoring. Finally, we did not elaborate the questionable (but categorical) assertion that one can have no reasonable expectation of privacy in any communications where one cannot see the other participant.
¶43 Despite the opinion’s analytical shortcomings, we cited Coleman favorably twice in the 1980s. In State v. Canon, 212 Mont. 157, 162-63, 687 P.2d 705, 707-08 (1984), we affirmed a district court’s denial of a motion to suppress a warrantless recording of a telephone conversation between the defendant and a consenting CI. Without independent analysis, we cited the abovementioned paragraph from Coleman and concluded: “We hold that the . . . telephone tapes were properly admitted in evidence.” Id. at 162-63, 687 P.2d at 708. Four years later, in State v. Brown, 232 Mont. 1, 6-7, 755 P.2d 1364, 1368 (1988), overruled in part, Goetz, ¶ 24, we again addressed the issue of warrantless participant monitoring. There, citing Hanley, Coleman, and Canon, we announced that consistent with the Montana Constitution, “if one party to a telephone conversation freely consents, the conversation can be electronically monitored and recorded without a warrant, and the evidence obtained is admissible in a subsequent criminal trial.” Id. at 7, 755 P.2d at 1368.[1]
*510 ¶44 We conclude that the weak analytical underpinnings of Coleman do not survive our landmark ruling in Goetz. The facts in Goetz resemble those of the abovementioned cases. Police surreptitiously and without a warrant monitored and recorded conversations between the defendants and CIs, who were outfitted with electronic recording devices. Goetz, ¶¶ 5, 7. One conversation took place in one defendant’s home, and another, in the other defendant’s car. Id. After the defendants were arrested and charged for distributing dangerous drugs, both moved to suppress evidence obtained from the electronic monitoring. Id. at ¶¶ 6, 8. The district court denied the motions, and the defendants then pled guilty (reserving their rights to appeal) and appealed the denial of the motions to suppress. Id. On appeal we considered whether warrantless participant recording of face-to-face conversations with CIs violated the defendants’ constitutional rights under Section 10 and Section 11, despite the CIs’ consent to the monitoring. Id. at ¶ 3.
¶45 We first addressed ostensibly conflicting precedent in Brown and Solis on the stated issue. Goetz, ¶¶ 15-24. We determined that since there was not a majority of the Court addressing the protections of the Montana Constitution in Solis, it was not controlling precedent. Id. at ¶ 18. However, we also declined to apply the rule from Brown, which had overruled Brackman in part and held that police need not obtain a warrant to monitor and record an in-person conversation if one party to the conversation consents. Instead, we concluded that Brown offered “little, if any, guidance” because of its reliance on federal jurisprudence in interpreting Section 10 (right to privacy) and Section 11 (right to be free from unreasonable searches and seizures) of the Montana Constitution. Id. at ¶ 24. Accordingly, we overruled Brown and examined “anew” the issue of warrantless electronic monitoring under the provisions of the Montana Constitution. Id. We then engaged in a three-part analysis, giving much weight to the individual’s right to privacy and the concerns about privacy expressed by the delegates at the Montana Constitutional Convention. See id. at ¶¶ 28-54. Ultimately, we concluded that the recordings were warrantless *511 searches that violated Sections 10 and 11, and that the district court erred in denying the defendants’ motions to suppress. Id. at ¶ 54.
¶46 Here, as in Goetz, we find our existing precedent on the dispositive issue wanting. Accordingly, we will address anew whether the surreptitious, warrantless participant recording of Allen’s telephone conversation with Golie violated Sections 10 and 11. Coleman, like Brown, analyzed this issue without giving any particularized consideration to the unique provisions of the Montana Constitution and merely adopted a rule identical to the federal interpretation of the Fourth Amendment of the United States Constitution. Coleman, 189 Mont. at 502-03, 616 P.2d at 1096. No case following Coleman has provided the analysis of the Montana Constitution that was lacking in Coleman. See Jones, ¶¶ 9-12, Brown, 232 Mont. at 6-7, 755 P.2d at 1368; Canon, 212 Mont. at 162-63, 687 P.2d at 707-08. Furthermore, as mentioned above, Coleman misread Hanley, which avoided analyzing the Montana Constitution, and cited a federal statute to support its interpretation of the Montana Constitution. Coleman, 189 Mont. at 502-03, 616 P.2d at 1096. As such, we cannot accept Coleman as the final word on the scope of the fundamental rights under the Montana constitution.

B. Analysis under Goetz

¶47 The Montana Constitution expressly protects the right to privacy of people in this state: “The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.” Mont. Const, art. II, § 10. The constitution further provides that “[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures.” Id at § 11. Read together, Sections 10 and 11 provide robust protection to people in Montana against government intrusions. See Goetz, ¶ 14 (noting that together these provisions provide greater protection against government searches than the federal Fourth Amendment). When a state action implicates these rights, we undertake a three-part analysis to determine whether the action is constitutional. Goetz, ¶ 27. First, we determine “whether the person challenging the state’s action has an actual subjective expectation of privacy.” Id. Second, we determine “whether society is willing to recognize that subjective expectation as objectively reasonable.” Id. If, after the first two steps, we conclude that the defendant did not have a subjective expectation of privacy or that society is unwilling to accept the expectation as reasonable, then no search (as contemplated by the Montana Constitution) has occurred: the police activity in question is *512 not limited by the Montana Constitution, and (absent controlling statute) police may conduct the activity at their discretion, checked only by their own self-restraint. See State v. Siegal, 281 Mont. 250, 274, 934 P.2d 176, 190 (1997), overruled in part on other grounds, State v. Kuneff, 1998 MT 287, ¶ 19, 291 Mont. 474, 970 P.2d 556. However, if there is a subjective expectation of privacy that society is willing to accept as reasonable, then the police conduct constitutes a search, subject to constitutional safeguards. Goetz, ¶ 27. We then consider the third step: whether the state action was justified by a compelling state interest or was undertaken with “procedural safeguards such as a properly issued search warrant or other special circumstances.” Id.
C. Subjective Expectation of Privacy ¶48 The touchstone of subjective expectations of privacy is not some physical location, but rather an individual’s desire to keep some aspect of his or her life secure from the perception of the general public. Goetz, ¶ 28; see also Katz v. United States, 389 U.S. 347, 351, 88 S. Ct. 507, 511 (1967) (“[T]he Fourth Amendment protects people, not places.”). “Where a person has gone to considerable trouble to keep activities and property away from prying eyes, the person evinces a subjective expectation of privacy in those activities and that property.” Goetz, ¶ 29. Furthermore, to maintain a subjective expectation of privacy in an activity or property, a person need not take extraordinary precautions to shield that activity or property from the public. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, vol. 1, § 2.1(c), 438-39 (4th ed., Thompson West 2004). Rather the focus of the inquiry should be on the “degree of public exposure” that occurs. Id. at 439 n. 95.
¶49 Here, we agree with the District Court that Allen expressed a subjective expectation of privacy in his telephone conversation with Golie. Allen testified at the suppression hearing that he did not know that his conversation with Golie was being recorded and that he believed the conversation was private. Allen also testified that he believed that Golie was not using the speaker phone function on her phone and that no third party was using an extension line to overhear the conversation. The recording of the telephone conversation itself further evidences Allen’s desire to keep the substance of his conversation away from any spying ears of the general public. First, because the conversation was telephonic, half of the conversation was entirely inaudible, making the substance of the conversation poorly intelligible, at best, to any outside listener. Second, it is apparent from the recording that Allen was moving while conversing with Golie: it is *513 highly unlikely that any listener would glean any intelligible information from overhearing a passing snippet spoken by one party to a conversation. Third, during the brief intervals in the conversation when background voices are audible, Allen limited his speech to innocuous platitudes, conveying no information about the topics that he and Golie were discussing (their relationship following the assault on Escobedo). The degree of police intrusion into Allen’s privacy by electronically recording the conversation far exceeded the degree to which Allen knowingly exposed this conversation to the public (passing snippets). We conclude that Allen had a subjective expectation of privacy that the conversation was not being surreptitiously recorded by a police informant.
¶50 The State argues that Allen had no subjective expectation of privacy because at one juncture in the recorded conversation he expressed an unwillingness to discuss certain information over the phone. The State cites the portion of the conversation when Golie asked Allen how he would be able to finish a tattoo that he started for her if he were to leave Havre. Allen indicated that she could meet him, and the following exchange occurred:
GOLIE: How am I supposed to do that when you won’t even tell me where you’re at?
ALLEN: I’ll tell you right where I’m at, where I’m going and everything, but I’m not going to do it over the phone, and certainly with no one else around.
GOLIE: That’s fine.
ALLEN: But no, in that situation I would bring you to the town where I am, but I would damn [sure] blindfold you before I took you to my house. I’ll blindfold anybody going to my house. No one’s going to know exactly where I live. Nobody. Because of what I’ll be doing. There’s no way. I don’t want anyone to know where it is ‘cause I don’t want to have to go through the whole situation I just went through to find out who spoke or who talked or whatever, you know. I’m not going to do that. If anything like that happens, I’ll know exactly who did it.
¶51 Contrary to the State’s argument, this exchange does not indicate that Allen had no subjective expectation of privacy in his phone conversation with Golie. The fact that Allen was especially paranoid about divulging where he lived does not prove that he subjectively expected his conversation to be open to the public. The above-quoted exchange indicates that Allen was unwilling to communicate his *514 whereabouts to anyone by any means. It also indicates that Allen had some (evidently justified) misgivings about the security of telephone conversations. However, if Allen did not expect his conversation to be private, he would not have limited the conversation as he did when he approached other people. The record indicates that Allen strove to shield his conversation from the public. His unwillingness to divulge his whereabouts does not negate this conclusion.

D. Whether Society Is Willing to Accept Allen’s Expectation as Reasonable

¶52 We next determine whether society (i.e., the citizens of Montana) is willing to recognize as reasonable the expectation that private cell phone conversations are not being surreptitiously monitored and recorded by agents working for the State. This requires us to evaluate the constitutional values and goals of our state’s political system. Goetz, ¶ 31. We must remember in making this determination that the privacy of all people in Montana is at stake, not merely the privacy of those people known or suspected of breaking the law. Id. at ¶ 32.
¶53 In Goetz we concluded-based on language of the Montana Constitution and the convictions expressed by delegates to the 1972 Constitutional Convention-that society is willing to recognize as reasonable “the expectation that conversations held in a private setting are not surreptitiously being electronically monitored and recorded by government agents.” Id. at ¶¶ 35-37. While this holding was limited to the facts of that particular case (warrantless recording of face-to-face conversations), the stated rationale was in no way limited to face-to-face conversations and logically extends to telephone conversations, as here, where one party maintains a subjective expectation of privacy. ¶54 To resolve the issue in Goetz, we turned to the debates of the state Constitutional Convention. Id. at ¶¶ 33-35. We cited statements by Delegates Campbell and Dahood on the right to privacy and the right to be free from unreasonable searches and seizures. Id. at ¶ 33. Both delegates decried electronic monitoring and eavesdropping in general, indicating that the protections of these rights were not limited to traditional physical locations:
[T]he [Bill of Rights] committee felt very strongly that the people of Montana should be protected as much as possible against eavesdropping, electronic surveillance, and such type of activities .... [I]t is inconceivable to any of us that there would ever exist a situation in the State of Montana where electronic surveillance could be justified.
Id. (quoting Montana Constitutional Convention, Verbatim Transcript, *515 March 7, 1972, pp. 1682,1687); see also Siegal, 281 Mont. at 276, 934 P.2d at 191 (noting that “the delegates . . . voiced clear opposition to any form of electronic surveillance of Montana citizens” (emphasis added)). This generalized distrust of electronic monitoring also appears in the comment of the Bill of Rights Committee that “the privacy of communications should remain inviolate ‘from state-level interceptions.’” Montana Constitutional Convention, Committee Proposals, Feb. 22, 1972, p. 633. Further indicating that all communications should enjoy protections from government intrusion, the committee commented that “any . . . legislative enactment [allowing wiretapping] would require, [under Section 10 and Section 11], the showing of a compelling state interest.” Id.
¶55 It also emerges from the transcript of the convention that the protections of the right to privacy were intended to be dynamic. Delegate Campbell introduced the right to privacy as a means of bolstering the protections against unreasonable searches and seizures by ensuring that those protections would be able to keep pace with and not be outstripped by technological developments:
Certainly, back in 1776, 1789, when they developed our Bill of Rights, the search and seizure provisions were enough .... However, today we have observed an increasingly complex society and we know that our area of privacy has decreased, decreased, decreased .... We feel that this [an express right to privacy], as a mandate to our government, would cause a complete reexamination and guarantee our individual citizens of Montana this very important right-the right to be let alone; and this has been called the most important right of them all .... “As government functions and controls expand, it is necessary to expand the rights of the individual.”
Montana Constitutional Convention, Verbatim Transcript, at 1681 (quoting Editorial, The Right of Privacy, Mont. Standard (Butte) 4 (Feb. 3, 1972)). Thus, as technological advancements allow personal communications to occur beyond a single physical setting, the constitutional protections of the right to privacy keep pace and are not left behind with each passing epoch.
¶56 As United States Supreme Court noted over forty years ago, the telephone has come to play a vital role in private communications. Katz, 389 U.S. at 352, 88 S. Ct. at 512. This role is even more pronounced today, and cell phones are ubiquitous in Montana, as elsewhere. See City of Ontario v. Quon, 177 L. Ed. 216, 227 (2010) (“Cell phone ... communications are so pervasive that some persons *516 may consider them to be essential means or necessary instruments for self-expression, even self-identification.”). To allow participant monitoring and recording of telephone conversations without a warrant and, thus, subject only to the self-restraint of law enforcement would “undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in free society.” White, 401 U.S. at 787, 91 S. Ct. at 1143 (Harlan, J., dissenting); see also id. (Douglas, J., dissenting) (“Monitoring, if prevalent, certainly kills free discourse and spontaneous utterances. Free discourse-a First Amendment value-may be frivolous or serious, humble or defiant, reactionary or revolutionary, profane or in good taste; but it is not free if there is surveillance.”). This respect for free and spontaneous discourse is reflected not only in our constitutional guarantee of privacy but also in § 45-8-213(l)(e), MCA, which criminalizes (with four exceptions) the surreptitious recording of a telephone conversation.
¶57 The history of Montana’s constitutional convention indicates that the delegates would not have countenanced warrantless monitoring of private telephone conversations at the time they drafted Montana’s constitution. We are convinced the citizenry of this state would not tolerate such unrestrained government conduct today. We therefore conclude that society is willing to recognize as reasonable the expectation that private cell-phone conversations are not being surreptitiously monitored and recorded by government agents. To the degree that Coleman and its progeny are inconsistent with this conclusion, they are expressly overruled.
¶58 The Dissent challenges this conclusion, advancing that the Montana Constitution does not protect telephone conversations from state electronic surveillance when, as here, one party consents. At bottom this argument rests on the reasoning drawn from the “obscene phone call hypothetical” in which party A receives an obscene phone call from party B. The Dissent contends that in this situation constitutional protections do not come into play and no warrant is required for police to monitor the call because (1) party A can consent to the recording and (2) party B has no expectation of privacy since he is violating the law. But this logic is flawed. It assumes that party B is violating the law before the conversation has been monitored. This turns the presumption of innocence on its head. Nothing in the transcripts of the Constitutional Convention suggests that the delegates wished to jettison the presumption of innocence and presume that all parties to a conversation who do not consent to its monitoring *517 are engaged in criminal activity. To the contrary, our presumption must be that persons conversing on phones are doing so legitimately and thus they have a reasonable expectation of privacy. The Dissent also suggests that police will be hindered in their ability to enforce the law unless allowed to monitor phone calls with the consent of only one party. This concern, however, ignores the basic constitutional principle that police must obtain warrants to conduct searches. If, to return to the hypothetical, police have probable cause to believe someone is making obscene phone calls, they can obtain a warrant to record the calls. When we allow the police to bypass the warrant requirement as an undue hindrance to effective law enforcement, we have effectively forfeited our rights to privacy and freedom from unreasonable searches.
¶59 The State argues that cell phones, like that used by Allen, are essentially radios, the transmissions of which may be received by unintended parties. Accordingly, citing State v. Cotterell, 2008 MT 409, 347 Mont. 231, 198 P.3d 254, the State argues that users of cell phones have no reasonable expectation of privacy. In Cotterell we concluded that the defendant did not have a reasonable expectation of privacy in communications over a hand-held radio. Id. at ¶ 52. Unlike Cotterell, here, the State cites no evidence from the record (aside from the unsupported assertions of the prosecutor) that Allen communicated over a public channel or that the transmissions could be overheard with equipment that is “easily obtained and readily available.” Id. at ¶ 53. Accordingly, we reject the State’s argument based on the radio analogy.
¶60 The State next suggests that the debates from the Constitutional Convention support its claim that society is unwilling to accept as reasonable expectations of privacy in telephone conversations. Specifically, the State notes Delegate Robinson’s withdrawal in response to opposition of a proposed amendment to Article II, Section 11, adding that “privacy of communications shall be inviolate.” Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1683-87. Contrary to the State’s argument, we cannot conclude that the withdrawal of a blanket prohibition on state intrusion upon private communications was an endorsement of unchecked, warrantless police monitoring of private telephone conversations.
¶61 In sum, we conclude that Allen had a subjective expectation of privacy in his cell-phone conversation with Golie and that our society is willing to recognize that expectation as reasonable. *518 Accordingly, Golie’s recording of the conversation at the behest of law enforcement constituted a search under Article II, Sections 10 and 11 of the Montana Constitution.

E. Nature of Government Intrusion

¶62 Having determined that a search occurred, we must next consider whether the search was reasonable; that is, whether it was justified by a narrowly tailored, compelling state interest or subject to adequate procedural safeguards. Goetz, ¶ 27. If not, then the search was unconstitutional. Id. Where, as here, police conduct a search without a warrant, then we consider it “per se unreasonable, absent a recognized exception.” Id. at ¶ 40. The State carries the burden of proving that an exception to the warrant requirement applies. Id.
¶63 The State argues that the consent exception applies by virtue of Golie’s agreement to record the conversation. We disagree. In Goetz, we considered application of the consent exception to police monitoring of face-to-face conversations where only one party to the conversation consents to the recording. Id. at ¶¶ 41-46. We concluded that the consent exception did not excuse the absence of a warrant. Id. at ¶ 46. To reach this conclusion, we adopted the complimentary rules regarding consent of a co-tenant announced in Georgia v. Randolph, 547 U.S. 103, 126 S. Ct. 1515 (2006): (1) the consent of a co-tenant to a search of shared premises is valid if the other co-tenant is absent, but (2) such consent is not valid if the other co-tenant is physically present and objects to the search. Goetz, ¶¶ 44-45. Applying this rule, the Goetz Court reasoned that since both parties were present, each must have the opportunity to object before police could conduct the search. Id. at ¶ 45.
¶64 Contrary to the State’s argument, this reasoning applies, without distortion, to the present situation involving a telephone conversation. While the parties to the conversation here, Allen and Golie, were not in the same physical location, they were both “present” during the conversation in that law enforcement could have obtained the consent of each to record the conversation. However, even though Allen was available to consent (or object) to the recording of the conversation, police did not give him the opportunity to do so. Accordingly, as in Goetz, the consent exception does not apply. The State does not argue that any other exception excuses its failure to obtain a warrant and cites no narrowly-tailored, compelling interest. Consequently, we conclude that the search (i.e., the recording of Allen and Golie’s conversation) was unreasonable and, thus, violative of Sections 10 and 11 of the Montana Constitution.
*519 ¶65 In the event of a new trial, the recording of Golie and Allen’s conversation may not be admitted into evidence.[2]
¶66 3. Whether the District Court abused its discretion when it denied Allen’s request for a jury instruction on accomplice testimony.
¶67 The final issue regards the District Court’s refusal of Allen’s proposed jury instruction regarding the “accomplice” testimony of Golie. Allen contends that this was error. The State disagrees. We conclude that the District Court erred in denying this instruction.
¶68 Section 26-1-303(4), MCA, reads: “The jury is to be instructed by the court on all proper occasions that:... the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust. . . .” We have interpreted this statute to entitle a criminal defendant to such an instruction in “all proper occasions.” State v. Johnson, 257 Mont 157, 163, 848 P.2d 496, 499 (1993). Our case law indicates that an occasion is proper when (1) an accomplice gives direct testimony, (2) the defendant requests such an instruction, and (3) the instruction is not inconsistent with the defendant’s claim of innocence. State v. Hall, 2003 MT 253, ¶ 30, 317 Mont. 356, 77 P.3d 239; Johnson, 257 Mont at 163, 848 P.2d at 499.
¶69 Here, these elements are met. The first inquiry is whether an accomplice gave direct testimony. A person is an accomplice and legally accountable for the acts of another when “either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense.” Section 45-2-302(3), MCA. Whether a person is an accomplice is a question for the jury, unless it is undisputed. Rose v. State, 1998 MT 342, ¶ 13, 292 Mont. 350, 972 P.2d 321.
¶70 Here the record contains ample evidence from which the jury could conclude that Golie was an accomplice to the attack on Escobedo. *520 Golie aided Allen in his assault on Escobedo by driving him to the residence were Escobedo was babysitting his nieces (which is undisputed). Moreover, the testimony of Pickens, Allen, Escobedo, and Golie, herself, if believed, supports the conclusion that Golie had the intention of promoting or facilitating the assault. Pickens testified that Golie encouraged Allen to go to Escobedo’s to “take care of business.” Allen’s testimony, while somewhat equivocal, seemed to indicate that Golie knew he wanted to assault Escobedo. Defense counsel asked Allen if he told Golie why he wanted to visit Escobedo, to which Allen responded, “Absolutely, yeah. She was all for it. Absolutely. She knew exactly what was going on.” Further, both Allen and Escobedo testified (and Golie agreed) that as soon as Escobedo entered the car Golie began to upbraid him for talking to others about her and that she was angry and threatening towards him.
¶71 There is no question that there was sufficient testimony from which a jury could conclude that Golie was an accomplice. Golie was one of the State’s principal witnesses and her testimony, which consumes nearly seventy pages of the transcript, was direct evidence against Allen. Allen requested a jury instruction that Golie’s testimony “ought to be viewed with distrust.” This request was not inconsistent with Allen’s claim of innocence: Allen admitted assaulting Escobedo, but denied using a weapon. Thus, Allen was entitled to a jury instruction that Golie’s testimony should be viewed with distrust. The District Court erred in denying this instruction. On retrial, Allen is entitled to a jury instruction regarding accomplice testimony under § 26-1-303(4), MCA.
¶72 For the foregoing reasons, Allen’s conviction is reversed and remanded for a new trial consistent with this opinion.
CHIEF JUSTICE McGRATH, JUSTICES WHEAT, COTTER and MORRIS concur.

 The Dissent incorrectly asserts that Hanley, Jones, and State v. Solis, 214 Mont. 310, 693 P.2d 518 (1984), held that warrantless participant monitoring is permissible under the Montana Constitution. Dissent, ¶ 150. However, as mentioned above, the Court in Hanley declined to address the legality of warrantless participant monitoring under the Montana Constitution. In Solis, the Court actually rejected the argument that warrantless participant monitoring of face-to-face conversations is constitutionally *510 permissible with the consent of one party. Solis, 214 Mont. at 315-320, 693 P.2d at 520-23 (plurality); Solis, 214 Mont. at 320, 693 P.2d at 523 (Sheehy, Haswell, Weber, JJ., specially concurring). Indeed, foreshadowing today’s ruling, the plurality in Solis recognized that Coleman and Cannon “may have gone farther than the Constitutional Convention delegates intended.” Id. at 318, 693 P.2d at 522 (plurality). Finally, in Jones, the Court declined to address the merits of the appellant’s constitutional challenge on account of inadequate briefing; thus, there was no constitutional holding. Jones, at ¶¶ 10-12.

 Justice Nelson’s concurrence suggests that the Court’s decision does not go far enough. He argues that failing to suppress Golie’s testimony “is akin to suppressing evidence obtained by means of an unlawful entry into the defendant’s home, but then allowing the officers to testify about that evidence and the fact that they found it in the defendant’s home.” First of all, since Allen’s motion was to suppress the recording, not Golie’s testimony, the issue is not before the Court. Secondly, the analogy fails. In the hypothetical, but for the illegal entry, the officer would not have been in the home to make observations. Accordingly, his observations and testimony along with the physical evidence obtained are fruits of the poisonous tree. Here Golie’s engaging in a cell phone conversation with Allen is not poisoned by the fact of the recording. It cannot be said that, but for the illegal recording, Golie would not have been conversing with Allen, particularly given that he invited her to participate in this escapade to begin with.