JUSTICE NELSON,
specially concurring.
¶27 Based on the procedural posture of this case and the specific issues raised by Simms on appeal, I join the Court’s decision, with the following caveat.
¶28 I continue to believe that the ongoing and admitted practices of Montana State Fund (MSF) and its Special Investigation Unit (SIU) with respect to the acquisition and dissemination of confidential criminal justice information are patently illegal. My rationales for reaching this conclusion are set forth, in substantial detail, in my dissenting opinion to this Court’s order in In re Rules of Prof. Conduct, No. OP 11-0439 (Nov. 1, 2011). I believe MSF’s and SIU’s practices unlawfully intrude upon the doctor-patient relationship, are contrary to the Montana Criminal Justice Information Act, and violate the constitutional rights of workers’ compensation claimants under Article II, Sections 10 and 11 of the Montana Constitution. Rules of Prof. Conduct at 8-32 (Nelson & Wheat, JJ., concurring in part and dissenting in part).
¶29 Notably, the absurdity of MSF’s procedures is on full display in this case. Only after MSF had already sent videotape footage (obtained by SIU investigators) to Simms’ attorney and to Simms’ treating physician did it then occur to MSF that maybe it ought to get a court order authorizing it, in the first instance, to "receive” this confidential criminal justice information from SIU. Opinion, ¶¶ 8-9. MSF and SIU believe that so long as SIU has not yet deemed investigative information in its possession to be “confidential criminal justice information,” SIU may share that information with MSF and MSF, in turn, may disseminate the information to whomever it wishes. This belief is flat wrong. Rules of Prof. Conduct at 14-18 (Nelson & Wheat, JJ., concurring in part and dissenting in part).
¶30 In this regard, Workers’ Compensation Court Judge Shea got it right when he concluded:
State Fund’s contentions blur the distinction between State Fund as a whole and the State Fund Fraud Group, the only part of State Fund which was designated as a criminal justice agency by Executive Order. State Fund argues, for example: ‘The State Fund’s SIU serves as an investigative tool both in the State *22 Fund’s role as a criminal justice agency as well as its primary role as an insurer.” Again, State Fund as a whole was not designated as a criminal justice agency; only that portion of State Fund which comprises the State Fund Fraud Group constitutes a criminal justice agency under §44-5-103(7), MCA.
The core of State Fund’s argument is that the SIU wears two hats: it sometimes functions just as any other investigator would for any other insurance company, and it sometimes functions as a criminal justice agency. The difficulty in State Fund’s position is that the Executive Order and the applicable statutes do not provide for this distinction. The SIU cannot conduct an investigation and then decide whether or not it did so wearing its criminal justice agency hat or its insurance investigator hat. That determination is made by statute [in particular, §44-5-103, MCA],
Mont. State Fund v. Simms, 2010 MTWCC 41, ¶¶ 12-13, 2010 MT Wrk. Comp. LEXIS 44 (Dec. 29, 2010) (emphasis in original, footnote omitted).
¶31 MSF took the position that the ten segments of surveillance video at issue did not become confidential criminal justice information until after it was reviewed by Simms’ physician, after Simms’ physician reported back to MSF that Simms’ activities depicted in the video were inconsistent with his reported limitations, and after SIU made its determination that “probable cause” existed that a crime had been committed. Judge Shea properly rejected this approach:
State Fund’s use of the “probable cause” standard for determining when an SIU investigation becomes confidential criminal justice information is incorrect. In the criminal code, probable cause is the standard for issuance of a search warrant, arrest of a criminal suspect, and filing criminal charges. In virtually all of those circumstances, some degree of criminal investigation precedes a probable cause determination. State Fund’s argument that it is only after a probable cause determination is made that the preceding investigation becomes criminal in nature, puts the proverbial cart before the horse. Following State Fund’s reasoning, a criminal justice agency could take surveillance video of a suspected drug dealer selling small baggies of white powder, yet the surveillance would not constitute a criminal investigation-and the surveillance thereby become confidential criminal justice information-until the criminal justice agency confirmed that the white powder was cocaine. Moreover, since the criminal justice agency itself makes the initial probable cause determination, State Fund’s argument would allow a *23 criminal justice agency to unilaterally determine when, if ever, investigatory materials “become” confidential criminal justice information. This would eviscerate the privacy protections afforded by the Criminal Justice Information Act.
Simms, 2010 MTWCC 41, ¶ 16 (emphases in original, footnotes omitted).
¶32 One other facet of this case deserves mention. As I discussed in Rules of Prof Conduct at 10, 24-29, SIU investigators conduct surreptitious videotaped surveillance of State Fund claimants without a warrant-such as occurred to Simms. This sometimes includes following a claimant around town, secretly videotaping his activities. State Fund argued that such surveillance is legal because “a person has no privacy expectation for what he or she does in plain view in public.” I disagreed with this proposition, noting that while a person cannot expect to preserve the same degree of privacy for himself or his affairs in public as he could expect at home, Montanans are not prepared to accept as reasonable State Fund’s proposition that the government can track and record our every move throughout the day. Rules of Prof Conduct at 25 (Nelson & Wheat, JJ., concurring in part and dissenting in part). To the contrary,
Montanans expect that they have a right of privacy in their affairs, even when they leave their homes-albeit, not to the same degree as they expect within their homes. We accept fixed cameras in various locations, like banks, parking garages, and businesses. We are willing to give up some privacy for the sake of the security that these devices provide. But we do not accept cameras that follow us all around town, monitoring and recording our every move for no purpose other than to detect and document evidence of unlawful activity.
Rules of Prof Conduct at 29 (Nelson & Wheat, JJ., concurring in part and dissenting in part).
¶33 Notably, the Supreme Court last week issued a decision in which this exact issue was discussed. United States v. Jones, No. 10-1259 (U.S. Jan. 23, 2012). There, the police, acting without a valid search warrant, attached a Global Positioning System (GPS) tracking device to Jones’s vehicle and then used that device to monitor the vehicle’s movements on public streets over a four-week period. The Supreme Court unanimously concluded that this was a search. The five-Justice majority reached this conclusion under a trespass rationaleJhe., that by attaching an information-gathering device to an “effect” (Jones’s vehicle), the government “physically occupied private property for the purpose of obtaining information,” which constitutes a search. Jones, *24 slip op. at 4, 9-10. The four Justices concurring in the judgment reached this conclusion based on Katz’s “reasonable expectation of privacy” test. See Jones, slip op. at 13-14 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment); see also Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring); State v. Allen, 2010 MT 214, ¶ 75, 357 Mont. 495, 241 P.3d 1045 (Nelson, J., specially concurring).
¶34 What are particularly noteworthy in the present context are the remarks of the concurring opinions in Jones. Justice Alito opined that relatively short-term monitoring of a person’s movements on public streets accords with expectations of privacy that our society has recognized as reasonable. He concluded, however, that the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. Jones, slip op. at 13 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment).
For such offenses, society’s expectation has been that law enforcement agents and others would not-and indeed, in the main, simply could not-secretly monitor and catalogue every single movement of an individual’s car for a very long period. In this case, for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving. We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was surely crossed before the 4-week mark. Other cases may present more difficult questions. But where uncertainty exists with respect to whether a certain period of GPS surveillance is long enough to constitute a Fourth Amendment search, the police may always seek a warrant.
Jones, slip op. at 13-14 (Alito, Ginsburg, Breyer, & Kagan, JJ., concurring in the judgment).
¶35 Justice Sotomayor, who joined the majority opinion, felt that the government’s physical invasion of personal property (Jones’s vehicle) to gather information was a search under the Fourth Amendment’s longstanding trespassory test, which Kate’s reasonable-expectation-of-privacy test augmented but did not displace. Jones, slip op. at 1-2 (Sotomayor, J., concurring). Nevertheless, she noted her agreement with Justice Alito that, at the very least, longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy under the Katz test as well. Jones, slip op. at 3 (Sotomayor, J., concurring). Justice Sotomayor then added:
In cases involving even short-term monitoring, some unique *25 attributes of GPS surveillance relevant to the Katz analysis will require particular attention. GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations. See, e.g., People v. Weaver, 12 N.Y.3d 433, 441-442, 909 N.E.2d 1195, 1199 (2009) (‘Disclosed in [GPS] data ... will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on”). The Government can store such records and efficiently mine them for information years into the future. [United States v. Pineda-Moreno, 617 F.3d 1120, 1124 (CA9 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc).] And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: ‘limited police resources and community hostility.” Illinois v. Lidster, 540 U.S. 419, 426 (2004).
Awareness that the Government may be watching chills associational and expressive freedoms. And the Government’s unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring-by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track-may “alter the relationship between citizen and government in a way that is inimical to democratic society.” United States v. Cuevas-Perez, 640 F.3d 272, 285 (CA7 2011) (Flaum, J., concurring).
I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one’s public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on.
Jones, slip op. at 3-4 (Sotomayor, J., concurring).
¶36 These observations resonate with respect to SIU’s admitted practice of tracking, monitoring, and videotaping workers’ compensation claimants as they go about their daily lives. MSF and *26 SIU are flat wrong in their belief that this sort of surveillance and information gathering does not implicate constitutional rights because “a person has no privacy expectation for what he or she does in plain view in public.” Montanans do retain expectations of privacy while in public. And Montanans do not reasonably expect that state government, in its unfettered discretion and without a warrant, is recording and aggregating their everyday activities and public movements in a manner which enables the State to ascertain and catalog their political and religious beliefs, their sexual habits, and other private aspects of identity.[1]
¶37 In its order in Rules of Prof. Conduct, this Court acknowledged “the troubling nature of some of the practices at issue,” but decided that Tt]he propriety of these practices should be addressed with the benefit of a fully developed record from a district court.” Rules of Prof. Conduct at 6. The Court likewise declines to delve into these matters in the present case, given the particular issues raised by Simms on appeal. In light of the Court’s narrow holdings herein, further discussion of MSF’s practices (beyond what I have already discussed above) is unnecessary. I appreciate, however, the Court’s cautioning statement that ‘the courts must fully comply with the statutory requirements of the Act before authorizing the release of the [confidential criminal justice] information.” Opinion, ¶ 25.
¶38 With these observations, I specially concur.
JUSTICE WHEAT joins in the Special Concurrence of JUSTICE NELSON.

Notably, Justice Sotomayor also suggested-and I agree-that ‘it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.” Jones, slip op. at 5 (Sotomayor, J., concurring). She pointed out that this approach is ill-suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. For example, people disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the email addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Yet, it is doubtful “that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. ... I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.” Jones, slip op. at 5-6 (Sotomayor, J., concurring).