GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

v.

ALFRED FRANCIS, Appellant

No. 74-1755

United States Court of Appeals

Third Circuit

Submitted under 3rd Cir. Rule 12(6) December 3, 1974

Filed January 10, 1975

THOMAS ALKON, ESQ. (ISHERWOOD, COLIANNI, ALKON & BARNARD), Christiansted, St. Croix, V.I., *for appellant*

JOHN S. WILBUR, JR., ESQ., Assistant U.S. Attorney, St. Croix, V.I., *for appellee*

Before SEITZ, *Chief Judge*, VAN DUSEN and ROSENN, *Circuit Judges*

OPINION OF THE COURT

## PER CURIAM:

This appeal challenges a judgment and commitment entered after a jury returned a guilty verdict on both a count charging assault in the first degree (14 V.I.C. § 295(3)) and a count charging burglary in the first degree (14 V.I.C. § 442(1)). Two men had forced their way into the apartment of Mrs. Boreiszo (the victim). One of the men shot her in the neck and personal property was stolen from her apartment by her assailants.

Appellant's principal contention is that the conduct of the pre-trial identification was so unnecessarily suggestive as to be a denial of due process of law. At the trial, the victim[1] testified that she eliminated three (Nos. 4–6) of six men in a lineup "immediately" and "looked at the other three" (N.T. 101 at 26a). She then eliminated No. 2, leaving two men in the lineup (N.T. 102 at 27a). The victim's testimony continued at N.T. 102–03:

"And then there were two and I looked at them and I felt that I had heels on while I was looking at them and the night it happened I did not, so I took my shoes off, or one shoe so that I could be on the height that I was on on the ground and then I knew at this height that I was looking directly into Francis.

"Q Did you identify anyone at that time?

"A I identified No. 3.

"Q Who was No. 3?

"A Alfred Francis.

---

[1] Many days before the lineup the victim had selected his photograph, as well as two others, and focused her attention on him as her assailant.

"Q Is that the defendant sitting here at the defense counsel table?

"A Yes.

"Q Was there anyone else in that lineup at this point?

"A No. I was still there and I did recognize his face from having seen him in some of the pictures that I had looked at and I made the remark that I remembered seeing him in the albums, in some pictures.

"Q Did you ever identify anyone else in that lineup?

"A No.

"Q And are you sure at that time that the person you identified as No. 3, or No. 3 was your assailant?

"A Yes.

"Q Are you sure now?

"A Yes."[2]

---

[2] See also Transcript of Hearing on Motion to Suppress at pp. 11–15:

"Q And that left only two then?
"A Only two.
"Q And there [sic] numbers were what?
"A 1 and 3.
"Q What, if anything, did you do with regard to them?
"A Well, I looked at them and I realized that I had heels on and at the time of this I did not have shoes on, so I took—
"Q At the time of this what?
"A The incident.
"Q The incident that happened to you?
"A I had no shoes on, so I took my shoes off and then I knew which one of the two because it put me on the same height that I recalled being face-to face with this person.
"Q So of those two who were there, did you then come to a conclusion as to any one of them?
"A Yes, it was number 3.
"Q And when you say it was number 3, what do you mean?
"A I concluded that number 3 was the one who had been facing me February 15th.
"Q Is that the man who assaulted you and shot you in the neck?
"A Yes.

.     .     .

"And specifically let me draw your attention to when it came down to the two, the 1 and 3, did you say anything in regard to any of them?
"A Yes, I did. I said in a casual way I remembered number 1, his picture being in the many pictures that I had looked through.
"Q When you say pictures you had looked through, are you referring to photographs shown to you by the police after the incident?
"A Yes.
"Q When you say you remarked about number 1—
"A I just recalled recognition from seeing the pictures in the books.
"Q When you chose number 3—that was the one you chose, was it not?
"A Yes.
"Q How do you feel, what is your state of mind regarding this identification? How do you feel?
"A I feel that I am right, I am sure that I had identified him.

484

In a May 30, 1974, Memorandum Opinion of the district court[3] denying the motion to dismiss, the court made these findings, among others:

"It was in connection with her [the victim's] identification of the defendant from the remaining two suspects that discrepancies in the testimony first developed.

"Defense Attorney Gamal distinctly recalls that the victim first identified suspect number one, and only changed her mind after being told by Assistant U.S. Attorney Wilbur to take her time and

---

"Q Have you seen him since that?
"A Since the lineup?
"Q Yes.
"A Yes.
"Q When was that?
"A Today.
"Q Where is he?
"A Where?
"Q Do you see him now?
"A Yes.
"Q Will you point him out to me? Just tell me. Is he in this courtroom?
"A Yes.
"Q Where in the courtroom? the left side or the right side of the courtroom?

*   *   *

"A On the right side.
"Q Go ahead. In what row is he sitting?
"A The first row.
"Q Where in the row?
"A The middle one, in the middle between two people.
"Q What is he wearing?
"A A jacket and a tie.

*   *   *

"MR. BRADY: Will the record reflect, please, that the witness has indicated the defendant Albert Francis."
At pp. 40–41, the victim testified:
"Q Again, while being questioned by Mr. Brady you said that you made a remark that one of the men was in a picture that you looked at; is that correct?
"A Yes, I did say that.
"Q Well, isn't it true, Mrs. Boreiszo, that you identified that person as your assailant?
"A No.
"Q That isn't true?
"A No; I recognized the picture and casually mentioned that I remember seeing that one in the albums.
"Q You don't remember saying that it was number 1 and after being told to take your time to be sure of your identification, then saying, 'No, I picked him out from the pictures I looked at'?
"A I don't remember saying that."

3 Government of the Virgin Islands v. Rivera and Francis, Criminal No. 74-29 (D. V.I.).

be sure. None of the other witnesses present recall the victim's having ever identified suspect one as her assailant. Instead they remember her having remarked that she recognized him but, on reflection, realized that this was because she had seen his photograph in one of the albums previously displayed to her. I am convinced that all of the witnesses testified to the facts as best they recalled them. However, I find as a fact that the victim never identified suspect one as her assailant. Instead I suspect that she stated 'I recognize him—number one' and then stood away from the viewing window. This initial recognition was probably misinterpreted by defense attorney Gamal as a statement that 'Number one is the man.' I find the subsequent explanation of her recognition believable and consistent with all the testimony.

"The identification of defendant Francis, number three, as her assailant followed shortly after the recognition of number one. I do not think the identification was the result merely of elimination of the other five suspects, leaving only one. Had defendant Francis not been her assailant the victim would have identified no one, as evidenced by her failure to select any of the photographs shown to her during the first sessions of photographic identification. The victim made only one identification at the lineup and testified in Court that she feels she was right about it.

"I conclude as a matter of law that on the totality of the surrounding circumstances the conduct of the lineup was not unduly prejudicial as fatally to taint a subsequent in-court identification. Coleman v. Alabama, 399 U.S. 1, 4 (1970)."

■ These findings are supported by the victim's testimony as noted above. Weighing all the circumstances, we find no substantial likelihood of misidentification. See Coleman v. Alabama, 399 U.S. 1 (1970) ; see also Neil v. Biggers, 409 U.S. 188, 198–200 (1972).

■ We agree with the district court that the comments of the United States Attorney to the victim during the lineup to "take her time" were unwise. See Memorandum of May 30, 1974, supra, at 21a. In order to avoid "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification [which] has been the degree of suggestion inherent in the manner in which the

prosecution presents the suspect to witnesses for pretrial identification," see United States v. Wade, 388 U.S. 218, 228 (1967), law enforcement authorities must take great care to avoid suggestive identification procedures. See also id. at 236 n. 26 (a model statute "would enjoin the police from suggesting to any viewer that one or more persons in the lineup had been arrested as a suspect"). In Simmons v. United States, 390 U.S. 377, 385 (1968), the Court noted that there was no evidence of verbal guidance by the police. See also Coleman v. Alabama, 399 U.S. 1, 6 (1970). Cf. Foster v. California, 394 U.S. 440, 443 (1969) ("[i]n effect, the police repeatedly said to the witness, 'This is the man' "). In Clemons v. United States, 408 F.2d 1230, 1237–38 (D.C. Cir. 1970), the court said:

"Any well-run department will presumably prepare—and enforce—careful regulations in this regard for the guidance of its personnel, as it will also do with respect to police station lineups. Apart from photographic leads and the familiar post-arrest police station confrontation, there are possible variations in the circumstances of arrest and detention where the right to counsel, as well as the demands of due process, will have to be defined and measured from case to case by reference to the reasonableness of the police conduct under the particular circumstances."

Any instructions to a witness to be careful or take her time should be given prior to the start of the lineup identification, rather than in the course of such a lineup.

The district court judgment and commitment will be affirmed.