******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOANNE A. SKOK
(SC 19415)

Rogers, C. J., and Palmer, Zarella, McDonald, Espinosa and Robinson, Js.

*Argued February 11—officially released September 15, 2015*

*John L. Cordani, Jr.*, with whom was *Damian K. Gunningsmith*, for the appellant (defendant).

*Lawrence J. Tytla*, supervisory assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. After a jury trial, the defendant, Joanne A. Skok, was convicted of larceny in the first degree in violation of General Statutes § 53a-122,[1] and conspiracy to commit larceny in the first degree in violation of General Statutes §§ 53a-48 and 53a-122. The convictions were based in part on evidence that included warrantless recordings of telephone conversations between the defendant and Jacqueline Becker, which were recorded with Becker's, but not the defendant's, consent. The principal issue on appeal[2] is whether the recording of those telephone conversations without a warrant or the defendant's consent violates the prohibition on unreasonable searches and seizures under article first, § 7, of the Connecticut constitution. The defendant also argues that she was denied due process because the trial court failed to conduct an independent inquiry regarding her competence to stand trial pursuant to *Pate* v. *Robinson*, 383 U.S. 375, 386, 86 S. Ct. 835, 15 L. Ed. 2d 815 (1966), after she alleged that her physical condition prevented her from sitting for trial for an extended period of time.[3] We conclude that recording a telephone conversation with the consent of one party to that conversation does not violate article first, § 7, of the state constitution, and that the trial court's failure to inquire into the defendant's competency was not improper. We therefore affirm the judgment of the trial court.

The jury reasonably could have found that the defendant defrauded Becker, an elderly widow, of tens of thousands of dollars when, after befriending Becker, she devised and developed a story designed to make Becker believe that the defendant was helping her resolve a legal dispute and that a supposed mob boss was involved in that dispute. The jury reasonably could have found the following facts in support of its verdict with respect to the crimes of which the defendant was convicted.

The defendant and Becker developed a close friendship after they worked together to organize a town fair. They talked on the telephone daily, visited each other's houses, and occasionally spent a holiday together. The two frequently discussed the happenings of their respective families, the town fair, financial and health problems, and other topics of common discussion among friends. As close friends are wont to do, Becker and the defendant shared confidences between themselves. When the defendant shared with Becker that she was unable to pay some of her medical bills related to various health problems she was suffering, Becker loaned her money to cover those expenses. Becker, too, at one point confided in the defendant and the defendant's husband, John Skok, regarding a legal problem she was facing. It was that revelation by Becker that provided the catalyst for the defendant's elaborate

ruse aimed at defrauding Becker out of her retirement savings.

Becker's legal issue first arose after she agreed to cosign a loan for her grandson to purchase a car. Becker submitted the application paperwork, but when she did not hear back from the automobile dealership and her grandson later came to her house with the car, Becker assumed that someone else had cosigned the loan because she never "sign[ed] the deed." Becker's grandson was later involved in a car accident and a legal action was brought against Becker after the car was repossessed. Though Becker claimed that the car was not hers, she later learned that the loan and the car's registration were in her name alone, and that her signature had been forged.

When Becker relayed these problems to the defendant, the defendant offered to help. She told Becker that John Skok's nephew, Stuart Skok, was employed by the Federal Bureau of Investigation (FBI) and could "quietly check" into what had happened with the car's registration. The defendant told Becker not to discuss Stuart Skok's involvement in the matter with anyone because he could get in trouble with the FBI if they knew he was working on a private case. The defendant later informed Becker that Stuart Skok's investigation had uncovered that a mob boss owned the dealership where the car was purchased. The defendant advised Becker that she needed to hire a private investigator and an attorney, and later informed her that a legal action would be filed on Becker's behalf against the mob boss. Becker never personally met or spoke with anyone named Stuart Skok, the purported private investigator, or the purported attorney. Rather, the defendant claimed that she would serve as the conduit for all of the necessary information between Becker and those individuals.

The defendant also claimed to serve as the conduit for the purported payments that Stuart Skok, the private investigator, and the attorney required for their services. The defendant periodically told Becker how much was supposedly owed and requested that a check for that amount be paid from Becker directly to the defendant and John Skok or that Becker deliver to the defendant or John Skok the requested amount in cash. Additionally, instead of repaying Becker for the loans she had made to the defendant to cover the defendant's medical costs, the defendant offered to reduce the amount Becker owed in litigation costs by whatever amount the defendant owed Becker.

In total, Becker gave the defendant more than $40,000. Although all of Becker's payments were deposited into a joint bank account belonging to the defendant and John Skok, there were never any withdrawals from that account that corresponded with the amounts deposited, nor any checks made out to Stuart Skok, or

to anyone who appeared to be an attorney or an investigator.

As time went on and Becker's payments amassed, the defendant's story spiraled into an even more implausible tale. The defendant explained that, in settlement of Becker's claims against the supposed mob boss, Becker was to receive proceeds from the sale of the mob boss' property in California to a South American diplomat. Unfortunately, according to the defendant, the settlement proceeds never arrived because the attorney to whom the diplomat's check was given had been hit by a car, and his briefcase, with the check inside, was missing.

In an effort to conceal her scheme, the defendant insisted that Becker not allow her family to overhear their conversations and admonished Becker to not tell her family about the defendant's involvement in the legal action against the mob boss. One of Becker's granddaughters, who had been living with her at the time, nevertheless became suspicious of the defendant's activities after she overheard Becker talking on the telephone with the defendant about an attorney in Brazil who had been struck by a car and lost a check that was supposed to be given to Becker. Becker's family members then contacted the police, who were unable to find any FBI personnel records associated with anyone named Stuart Skok.

When police officers met with Becker at her home to discuss the defendant's conduct, she agreed to allow them to set up recording equipment on her telephone. The officers instructed Becker on how to use the recording equipment and told her that, if the defendant called and began discussing Becker's legal action, she should try to coax further conversation on that topic from the defendant. Becker then recorded multiple conversations with the defendant wherein the defendant insisted that Becker not allow her family members to overhear their conversations and then made references to "Stu"—referring to Stuart Skok—"lawyers," and "the mob." The defendant also expressed her concern that an attorney sent to South America to receive funds from the sale of a mob boss' house had been intentionally hit by a car and demanded that Becker ask her financial advisor to disperse funds from her retirement account immediately so that Becker could pay the defendant for attorney's fees.

A state police officer was later present for and recorded a conversation between Becker and the defendant, after he coached Becker on the types of questions to ask during the call. During that call, in response to Becker's allegations that the defendant had stolen her money, the defendant asserted that she was only trying to help Becker and claimed that the money went "where it was supposed to go." The defendant again made references to an attorney, the mob, and Stuart Skok, and

insisted that "Stu" was a real person. The recordings were admitted as full exhibits at trial and were played for the jury without objection by the defendant.

Following trial, the jury returned a verdict of guilty on both counts alleging larceny in the first degree and conspiracy to commit larceny in the first degree. The trial court thereafter rendered judgment in accordance with the verdict, and this appeal followed. See footnote 2 of this opinion.

I

We begin with the defendant's claim that the recorded telephone conversations between Becker and herself were obtained in violation of article first, § 7, of the Connecticut constitution. The defendant contends that she had a reasonable expectation of privacy in her telephone conversations with Becker, notwithstanding Becker's consent to record them. She therefore argues that recording the conversations without first obtaining a warrant was unconstitutional because no exception to the warrant requirement applies in this case. Because the defendant did not object to the admission of the recordings at trial, however, she seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See id. (permitting defendant to prevail on unpreserved claim only if: "[1] the record is adequate to review the alleged claim of error; [2] the claim is of constitutional magnitude alleging the violation of a fundamental right; [3] the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and [4] if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt" [footnote omitted]); see also *In re Yasiel R.*, 317 Conn. 773, 781,      A.3d      (2015) (modifying third prong of *Golding*). The state agrees with the defendant that the first two prongs of *Golding* are satisfied and concedes that if the admission of the tape recordings was improper, it was not harmless error. The state argues, however, that the defendant's constitutional rights were not violated, and, therefore, her claim fails under the third prong of *Golding*. We agree.

Article first, § 7, of the Connecticut constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ." In defining the scope of that right, we focus on the defendant's reasonable expectation of privacy. *State* v. *Davis*, 283 Conn. 280, 324, 929 A.2d 278 (2007). If a defendant has no reasonable expectation of privacy in the object of the search, "subsequent police action has no constitutional ramifications." (Internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 718, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011). To determine whether a defendant has a reasonable expectation of privacy, we use the two

part test that Justice Harlan set forth in his concurrence in *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). That test asks, first, whether the defendant manifested a subjective expectation of privacy, and, second, whether that expectation is one that society would consider reasonable. Id.; see *State* v. *Boyd*, supra, 718; see also, e.g., *State* v. *DeFusco*, 224 Conn. 627, 636, 620 A.2d 746 (1993) (no reasonable expectation of privacy in garbage placed on curb in front of defendant's house because myriad of intruders could have sorted through it).

This court has not yet considered whether, under article first, § 7, of the state constitution, recording a telephone conversation with the consent of only one party violates the nonconsenting individual's reasonable expectation of privacy, although we have previously upheld such recordings as constitutional under the fourth amendment to the federal constitution. See *State* v. *Grullon*, 212 Conn. 195, 207 n.7 and 207–208, 562 A.2d 481 (1989). A practice permitted under the fourth amendment, however, may still be prohibited under the Connecticut constitution because the federal constitution "establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). "In determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in *Geisler*. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]." (Internal quotation marks omitted.) *State* v. *Kelly*, 313 Conn. 1, 14, 95 A.3d 1081 (2014); see also *State* v. *Lockhart*, 298 Conn. 537, 546–47, 4 A.3d 1176 (2010). We have noted, however, that "these factors may be inextricably interwoven, and not every [such] factor is relevant in all cases."[4] (Internal quotation marks omitted.) *State* v. *Kelly*, supra, 14–15.

At the outset, we recognize that two *Geisler* factors—the first and the fifth—do not support the defendant's claim that the conduct at issue in the present case violated her rights under article first, § 7, and indeed, the defendant concedes as much. With respect to those factors, this court recently explained: "[N]either the text nor the history of article first, § 7, [of the state constitution] provides any reason to depart from the United States Supreme Court's interpretation of the federal constitution . . . . As we have previously held, the text of article first, § 7, is similar to the text of the fourth amendment.[5] . . . Moreover, [w]ith respect

. . . to . . . the historical circumstances surrounding the adoption of article first, § 7 . . . we have stated that [t]he declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. . . . The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate. . . . Thus, the circumstances surrounding the adoption of article first, § 7, lend weight to the view that, in most cases, a practice permitted under the fourth amendment is permissible under article first, § 7." (Citation omitted; footnote added; internal quotation marks omitted.) *State* v. *Williams*, 311 Conn. 626, 634, 88 A.3d 534 (2014).

Furthermore, because Connecticut courts have not yet considered whether article first, § 7, provides greater protection than the federal constitution with respect to recording telephone conversations with only one party's consent, the second *Geisler* factor also does not support the defendant's claim. See *State* v. *Davis*, supra, 283 Conn. 310 (where issue was left unresolved by prior Connecticut cases, second *Geisler* factor did not support defendant's claim). The cases on which the defendant relies in support of her argument to the contrary are inapposite in the present case. The defendant cites cases that support the proposition that a warrant is generally required when law enforcement officials seek to search a place or object in which a defendant has a reasonable expectation of privacy. See, e.g., id., 311. The defendant also argues that the constitutional preference for a warrant is only overcome in specific and limited circumstances. See, e.g., *State* v. *Joyce*, 229 Conn. 10, 24–25, 639 A.2d 1007 (1994); *State* v. *Miller*, 227 Conn. 363, 382–85, 630 A.2d 1315 (1993). These principles, however, do not enlighten our analysis for determining whether a defendant has a reasonable expectation of privacy in the object of the search, such that a warrant would be required in the first instance. See *State* v. *Brown*, 198 Conn. 348, 355, 503 A.2d 566 (1986) ("Because the constitutional prohibition against unreasonable searches and seizures affords protection only against invasions of reasonable expectations of privacy . . . our threshold inquiry is whether the defendant in fact possessed a reasonable expectation of privacy . . . . Absent such an expectation, the subsequent police action has no constitutional ramifications." [Citations omitted.]). Accordingly, we are not persuaded by the defendant's argument as to the second *Geisler* factor.

Our resolution of this claim, then, is guided by our analysis of the third, fourth and sixth prongs of *Geisler*. Consequently, we next consider whether federal precedent supports the defendant's argument that recording her telephone conversations with Becker's consent violated her constitutional rights. Through a series of

cases, the United States Supreme Court has made it apparent that the fourth amendment does not prohibit such recordings. In *Lee* v. *United States*, 343 U.S. 747, 72 S. Ct. 967, 96 L. Ed. 1270 (1952), the court held that it was not unconstitutional under the fourth amendment for a "false friend"; id., 757; i.e., an individual working as an undercover agent for law enforcement, to enter the defendant's place of business and, while wired for sound, engage the defendant in a conversation wherein he made incriminating statements. Id., 749–51. The court noted in that case that the defendant was simply "talking . . . indiscreetly with one he trusted," and that the fact that he was overheard by the use of a wire had no constitutional ramifications because the recording was "with the connivance of one of the parties" to the conversation. Id., 753–54. This holding was reaffirmed in subsequent cases. See, e.g., *Hoffa* v. *United States*, 385 U.S. 293, 302, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (fourth amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it"); *Lopez* v. *United States*, 373 U.S. 427, 439, 83 S. Ct. 1381, 10 L. Ed. 2d 462 (1963) (permissible to record in person conversations because defendant has no "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment").

Although *Lee*, *Hoffa*, and *Lopez* all preceded the adoption of the reasonable expectation of privacy test in *Katz*, in *United States* v. *White*, 401 U.S. 745, 749–50, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971), a plurality of the court concluded that the principles announced in those cases were "left undisturbed by *Katz*."[6] In *White*, the court concluded that, although the defendant may have had a subjective expectation of privacy in conversations that were transmitted by a wire concealed on a government informant, such an expectation was not objectively reasonable, and, therefore, the defendant's fourth amendment claim failed on the second prong of the *Katz* test. Id., 751–52. Pointing to its prior precedents, the court explained: "If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the [s]tate's case." Id., 752. The court further explained that "one contemplating illegal activities must realize and risk that his companions may be reporting to the police," and that, in determining whether to confide in or conspire with another person regarding those illegal activities, it seemed unlikely that a defendant "would distinguish between probable informers on the one hand and probable informers with transmitters on the other." Id. Although *White* involved the recording of in person conversations between a

defendant and an informant, the reasoning in *White* has been uniformly applied in subsequent federal cases to conclude that recording *telephone* conversations with only one party's consent, without a warrant, is also permissible under the fourth amendment.[7] See, e.g., *United States* v. *Santillo*, 507 F.2d 629, 635 (3d Cir.), cert. denied sub nom. *Buchert* v. *United States*, 421 U.S. 968, 95 S. Ct. 1960, 44 L. Ed. 2d 457 (1975); *United States* v. *Bonanno*, 487 F.2d 654, 658 (2d Cir. 1973); *Holmes* v. *Burr*, 486 F.2d 55, 60 (9th Cir.), cert. denied, 414 U.S. 1116, 94 S. Ct. 850, 38 L. Ed. 2d 744 (1973).

Notwithstanding *White*, the defendant contends that federal precedent supports her argument that recording telephone conversations with the consent of only one party violates her constitutional rights. She argues that *White* should have little persuasive value in our analysis because it was a plurality opinion which has been the subject of academic criticism.[8] We disagree. We first note that the fact that academics have criticized the rule in *White* does not mean that its precedential value was altered. Moreover, the defendant's argument ignores that the plurality's decision was the logical extension of the court's prior precedent, and that, although the rule in *White* only garnered the support of four justices at the time it was decided, the so-called third-party consent rule in *White* has been cited approvingly by a majority of the court in subsequent cases and has been followed in every federal court of appeals. See, e.g., *United States* v. *Caceres*, 440 U.S. 741, 744, 99 S. Ct. 1465, 59 L. Ed. 2d 733 (1979) ("[n]either the [c]onstitution nor any [a]ct of Congress requires that official approval be secured before conversations are overheard or recorded by [g]overnment agents with the consent of one of the conversants").[9] Thus, federal cases considering reasonable expectations of privacy under the fourth amendment strongly support the conclusion that it is not unconstitutional to record a telephone conversation with only one party's consent, and, therefore, the third *Geisler* factor also does not support the defendant's claim.

With respect to the fourth *Geisler* factor, namely, persuasive sister state precedents, an overwhelming majority of states have concluded, in varying contexts, that it is permissible under their state constitutions for law enforcement officials to overhear or record conversations without a warrant, if they have one party's consent to do so.[10] See, e.g., *Commonwealth* v. *Rekasie*, 566 Pa. 85, 96, 778 A.2d 624 (2001) ("A telephone call received by or placed to another is readily subject to numerous means of intrusion at the other end of the call, all without the knowledge of the individual on the call. Extension telephones and speakerphones render it impossible for one to objectively and reasonably expect that [a call] will be free from intrusion."). Indeed, our research has revealed only one state—Montana—that has found it unconstitutional to

record telephone conversations with only one party's consent.[11] *State* v. *Allen*, 357 Mont. 495, 516, 241 P.3d 1045 (2010). That decision, however, was based in large part on the court's recognition that the Montana constitution contains a provision that protects the "right of individual privacy"; id., 511; and that during the debates of the 1972 state constitutional convention adopting that provision, delegates specifically "decried electronic monitoring and eavesdropping in general" when considering the adoption of that provision. Id., 514.

In support of her argument, the defendant also relies on the decisions of six states that have held unconstitutional the warrantless audio recording of face-to-face conversations between the defendant and a police informant. See *State* v. *Glass*, 583 P.2d 872, 879 (Alaska 1978); *Commonwealth* v. *Blood*, 400 Mass. 61, 70, 507 N.E.2d 1029 (1987); *State* v. *Goetz*, 345 Mont. 421, 439, 191 P.3d 489 (2008); *Commonwealth* v. *Brion*, 539 Pa. 256, 257, 652 A.2d 287 (1994); *State* v. *Blow*, 157 Vt. 513, 519, 602 A.2d 552 (1991); *State* v. *Mullens*, 221 W. Va. 70, 91, 650 S.E.2d 169 (2007). She contends that these cases support her position that it is unconstitutional to record, without a warrant, a private telephone conversation with only one party's consent because these cases stand for the proposition that "it is perfectly reasonable for individuals to expect that their private conversations are not being electronically monitored . . . ." In all but one of these cases, however, the court reached its conclusion in large part because the conversations that were recorded took place entirely within the confines of *the defendant's* home, and the court recognized that activities occurring within the home have been given the utmost constitutional protection. See, e.g., *Commonwealth* v. *Brion*, supra, 260 ("[i]f nowhere else, an individual must feel secure in his ability to hold a private conversation within the four walls of his home").[12] Moreover, three of those courts that concluded that it is unconstitutional to record in person conversations later distinguished that factual scenario from a situation like the one at issue in the present case, where one party to a *telephone* conversation consents to having that conversation overheard or recorded by the police. See *Commonwealth* v. *Eason*, 427 Mass. 595, 600, 694 N.E.2d 1264 (1998) (The court held that it was permissible under its state constitution for the police to overhear conversations between the defendant and an informant because the "defendant knew, when speaking on the telephone, that his words were being transmitted electronically beyond his home. . . . [H]e had no reason to assume that the conversation would not be heard by a third party. A person cannot control the conditions at the other end of a telephone conversation."); *Commonwealth* v. *Rekasie*, supra, 566 Pa. 97 (The expectation of privacy in a face-to-face conversation occurring solely within the home is "[q]ualitatively different" than a telephone call, where "an individual has no ability to

create an environment in which he or she can reasonably be assured that the conversation is not being intruded upon by another party. On the telephone, one is blind as to who is on the other end of the line."); *State* v. *Wetter*, 190 Vt. 476, 483, 35 A.3d 962 (2011) ("[w]hile a person may have a reasonable expectation that face-to-face conversations with another person in his or her own home are not being broadcast outside the home," no reasonable expectation of privacy in telephone conversation because individual has no "knowledge of the circumstances at the other end of the conversation").[13] Even assuming, without deciding, that we agree with those courts that have found a reasonable expectation of privacy in face-to-face conversations occurring within the home, we believe that there is a logical distinction between those situations and the one at issue in the present case. Thus, the fourth *Geisler* factor also weighs strongly against expanding the reach of article first, § 7, to protect those situations where an individual who is voluntarily cooperating with law enforcement officers consents to the recording of a telephone conversation.

As for the final *Geisler* factor—public policy—the defendant argues that our legislature has evinced a policy of intolerance for the surreptitious recording of telephone conversations. We first note that the legislature has not made it a criminal offense to record a private telephone conversation when one party to the conversation consents to the recording. See General Statutes § 53a-187 (a) (1) (defining " '[w]iretapping' " as "the intentional overhearing or recording of a telephonic . . . communication . . . by a person other than a sender or receiver thereof, without the consent of either the sender or receiver"); General Statutes § 53a-188 (a) (2) (person is guilty of tampering with private communication only where "he does not have the consent of the sender or receiver"). The legislature has, however, created a civil cause of action against a person who records a private telephone conversation without the consent of all parties to the communication. General Statutes § 52-570d (a) prohibits the use of "any instrument, device or equipment to record an oral private telephonic communication unless the use of such instrument, device or equipment . . . is preceded by consent of all parties to the communication," or other statutorily defined signals are provided that warn a party to the communication that it is being recorded. Although this statute does exhibit a policy concern for privacy, we note that it also contains multiple, wideranging exceptions, including that it does not apply to "[a]ny federal, state or local criminal law enforcement official who in the lawful performance of his duties records telephonic communications"; General Statutes § 52-570d (b) (1); or to "[a]ny person who, as the recipient of a telephonic communication which conveys threats of extortion, bodily harm or other unlawful

requests or demands, records such telephonic communication . . . ."[14] General Statutes § 52-570d (b) (3). This statute, therefore, does not reflect a sweeping policy against recording all private telephone conversations as the defendant suggests, but rather demonstrates that the legislature has carefully balanced the concern for protecting citizens' privacy against multiple other countervailing policy interests.[15]

In sum, the *Geisler* factors clearly counsel against concluding that the defendant had an objectively reasonable expectation of privacy in her telephone conversations when Becker consented to having them recorded. Although she may have had a subjective expectation that their conversations would remain private, the defendant's repeated insistence that Becker should not allow her family members to overhear their conversations demonstrates that even the defendant assumed that there was a reasonable possibility that they could or would do so. Cf. *State* v. *Wetter*, supra, 190 Vt. 482 (defendant's assertion that she could not discuss certain topic on telephone "demonstrated [that] she did not want to get caught speaking about the crime, [but] also demonstrated that she did not expect the telephone conversation to be private"). Thus, we conclude that the defendant did not have a reasonable expectation of privacy in the telephone conversations recorded with Becker's consent and, therefore, that the recordings were not obtained in violation of article first, § 7, of the Connecticut constitution.

II

We next consider the defendant's claim that she was denied due process because the trial court failed to conduct an inquiry, pursuant to *Pate* v. *Robinson*, supra, 383 U.S. 385, regarding her competence to stand trial. The defendant contends that, even though defense counsel repeatedly disavowed the need for a competency hearing and only requested a continuance of the trial to allow the defendant to obtain medical treatment for a chronic medical condition,[16] there was sufficient evidence before the court to require that it, sua sponte, conduct an independent inquiry regarding the defendant's ability to understand the proceedings against her or to assist in her defense. In support of this claim, the defendant relies on various statements made by defense counsel to the court before the trial began regarding the defendant's health. Those statements, broadly characterized, indicated that the defendant suffered from a chronic heart condition, that she experienced drowsiness during jury selection, and that she is prescribed a long list of medications to control her health problems.[17] We find this claim wholly lacking merit.

It is well settled that "the due process clause of the fourteenth amendment to the United States constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial." (Internal quotation

marks omitted.) *State* v. *Dort*, 315 Conn. 151, 162, 106 A.3d 277 (2014); see also *Medina* v. *California*, 505 U.S. 437, 439, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). A defendant is deemed incompetent if she lacks the "present ability to consult with [her] lawyer with a reasonable degree of rational understanding" or if she lacks "a rational as well as factual understanding of the proceedings against [her]." (Internal quotation marks omitted.) *Drope* v. *Missouri*, 420 U.S. 162, 172, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); see also General Statutes § 54-56d (a) (codifying constitutional mandate).[18] Although all defendants are presumed to be competent, in *Pate*, the United States Supreme Court held that due process requires that a trial court conduct an "adequate hearing" regarding a defendant's competency, once her competency "has been sufficiently called into question . . . ." *State* v. *Dort*, supra, 162, citing *Pate* v. *Robinson*, supra, 383 U.S. 386. A trial court has an independent obligation to inquire, sua sponte, into a defendant's competency when there is sufficient evidence before the court to raise a reasonable doubt as to whether the defendant can understand the proceedings or assist in her defense. See *State* v. *Connor*, 292 Conn. 483, 523, 973 A.2d 627 (2009); *State* v. *DeAngelis*, 200 Conn. 224, 242, 511 A.2d 310 (1986).

We begin by noting that it is only in rare cases that a defendant's physical disability would render her incompetent to withstand trial. See, e.g., *United States* v. *Doran*, 328 F. Supp. 1261, 1263–64 (S.D.N.Y. 1971) (defendant unfit to stand trial when he appeared gravely ill, there was substantial chance that trial may kill him, and court noted that it was more than ten years since alleged wrongs occurred); cf. *United States* v. *Schaffer*, 433 F.2d 928, 930 (5th Cir. 1970) (where fall left defendant with some continuing back pain, trial judge properly permitted trial to proceed on basis that defendant was competent to assist in his own defense). In the present case, there is no evidence indicating how the defendant's physical ailments, such as her heart condition or the fact that she takes multiple prescription medications for that condition or other undisclosed conditions, would have rendered her incapable of understanding the proceedings against her or assisting in her defense. The defendant contends, however, that a note from her primary care physician, which she provided to the court before trial in support of her unsuccessful request for a continuance, indicated that, because her heart condition was recently complicated by an "acute illness," she was unable to withstand a trial for the following three to four weeks. That note, however, was never made part of the record by the defendant. Thus, to the extent the defendant relies on it as evidence of her incompetency, the record is inadequate for our review. See, e.g., *Finan* v. *Finan*, 287 Conn. 491, 495, 949 A.2d 468 (2008) ("[t]he purpose of marking an exhibit for identification is to preserve it

as part of the record and to provide an appellate court with a basis for review" [internal quotation marks omitted]). Moreover, even assuming that the defendant accurately represents the contents of that note, the defendant's inability to sit for trial for several weeks would have no bearing on whether she was able to understand the proceedings against her or assist in her defense, but rather would be relevant only to whether a continuance should have been ordered, a claim that the defendant does not make on appeal.

With respect to the defendant's alleged drowsiness during jury selection, our research leads us to conclude that such a condition does not render a defendant incompetent to withstand trial. See *Woods* v. *McBride*, 430 F.3d 813, 819 (7th Cir. 2005) ("there is a big difference between the sort of temporary incompetence stemming from [the defendant's medically] induced drowsiness during voir dire and the sort that would render [the defendant] incapable of standing trial altogether"), cert. denied, 549 U.S. 958, 127 S. Ct. 391, 166 L. Ed. 2d 279 (2006); *Watts* v. *Singletary*, 87 F.3d 1282, 1287 (11th Cir. 1996) ("there is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court—whether out of indifference, fear, confusion, boredom, or sleepiness—unless that defendant also cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense"). The defendant points to no authority to the contrary. Moreover, although the trial court denied defense counsel's requests for a continuance, it did agree to provide her with accommodations throughout the trial should a health issue arise. Indeed, the record reflects that such accommodations were provided when, for example, defense counsel requested that the court end jury selection early because the defendant felt faint.

Thus, because there was no evidence before the trial court indicating that the defendant could not understand the proceedings against her or assist in her defense, the court did not violate the defendant's right to due process by failing to conduct, sua sponte, an independent inquiry regarding her competence.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER, ESPINOSA and ROBINSON, Js., concurred.

[1] We note that § 53a-122 was amended by the legislature in 2009 during the events underlying the present case; see Public Acts 2009, No. 09-138, § 1; that amendment has no bearing on the merits of this appeal. We refer to the current revision of the statute in this opinion.

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] It is not clear whether the defendant's due process claim is predicated on the state or federal constitution, but, because she has not provided an independent analysis of this issue under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we deem abandoned any state constitutional due process claim. See, e.g., *Barros* v. *Barros*, 309 Conn. 499, 507 n.9, 72

A.3d 367 (2013) ("we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue" [internal quotation marks omitted]). Accordingly, we analyze the defendant's due process claim under the federal constitution only.

[4] Although Justice Zarella raises a concern in his concurring opinion regarding this court's application of the *Geisler* factors, because the parties have not asked us to reconsider how we apply *Geisler*, we need not address this issue.

[5] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[6] Four justices agreed with this conclusion. *United States* v. *White*, supra, 401 U.S. 746. Justice Black concurred in the judgment, but adhered to his position that *Katz* was wrongly decided. Id., 754.

[7] Cf. *Rathbun* v. *United States*, 355 U.S. 107, 111, 78 S. Ct. 161, 2 L. Ed. 2d 134 (1957) (A telephone conversation that is overheard with one party's consent is not "interception" under the federal wiretap act because "[e]ach party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain.").

[8] See, e.g., G. Ashdown, "The Fourth Amendment and the 'Legitimate Expectation of Privacy,' " 34 Vand. L. Rev. 1289, 1311 (1981) (arguing that reasoning in *White* is flawed because privacy expectations are altered considerably when conversations are electronically transmitted, and that, even if one may reasonably expect that remarks "will [not] remain absolutely confidential, it is unlikely that he appreciates the risk of their disclosure to the government"); S. Brenner & L. Clarke, "Fourth Amendment Protection for Shared Privacy Rights in Stored Transactional Data," 14 J.L. & Policy 211, 215 (2006) (arguing that third-party consent doctrine should not allow government to "reap a windfall" in technology age where, perhaps unknowingly, significant amount of private data is disclosed to third parties); A. Loewy, "The Fourth Amendment as a Device for Protecting the Innocent," 81 Mich. L. Rev. 1229, 1256–63 (1983) (arguing that third-party consent doctrine inappropriately focuses on rights of guilty, rather than innocent, persons).

[9] See also *United States* v. *Jacobsen*, 466 U.S. 109, 122–23, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *United States* v. *Jones*, 533 Fed. Appx. 562, 571 (6th Cir.), cert. denied,      U.S.      , 134 S. Ct. 834, 187 L. Ed. 2d 693 (2013); *United States* v. *Novak*, 531 F.3d 99, 101 (1st Cir. 2008); *United States* v. *Brathwaite*, 458 F.3d 376, 380 (5th Cir. 2006); *United States* v. *Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003); *United States* v. *Longoria*, 177 F.3d 1179, 1183–84 (10th Cir. 1999); *In re Askin*, 47 F.3d 100, 104–105 (4th Cir.), cert. denied, 516 U.S. 944, 116 S. Ct. 382, 133 L. Ed. 2d 305 (1995); *United States* v. *Smith*, 918 F.2d 1551, 1558 (11th Cir. 1990); *United States* v. *Chiavola*, 744 F.2d 1271, 1275 (7th Cir. 1984); *United States* v. *Scios*, 590 F.2d 956, 991 n.73 (D.C. Cir. 1978); *United States* v. *Santillo*, supra, 507 F.2d 635; *United States* v. *Bonanno*, supra, 487 F.2d 658; *Holmes* v. *Burr*, supra, 486 F.2d 60; see also *People* v. *Collins*, 438 Mich. 8, 24, 475 N.W.2d 684 (1991) (noting that United States Supreme Court's decision in *United States* v. *Caceres*, supra, 440 U.S. 741, "made crystal clear" that fourth amendment to federal constitution does not require warrant to record telephone conversation with informant's consent).

[10] Multiple courts have reached this conclusion specifically in the context of police recording of telephone conversations. See, e.g., *People* v. *Strozzi*, 712 P.2d 1100, 1102–1103 (Colo. App. 1985), cert. denied, 476 U.S. 1105, 106 S. Ct. 1950, 90 L. Ed. 2d 359 (1986); *State* v. *Graham*, 70 Haw. 627, 638–40, 780 P.2d 1103 (1989); *People* v. *Shinkle*, 128 Ill. 2d 480, 486, 539 N.E.2d 1238 (1989); *Carrier* v. *Commonwealth*, 607 S.W.2d 115, 117 (Ky. App. 1980); *People* v. *Collins*, 438 Mich. 8, 40, 475 N.W.2d 684 (1991); *State* v. *Geraldo*, 68 Ohio St. 2d 120, 126, 429 N.E.2d 141 (1981), cert. denied, 456 U.S. 962, 102 S. Ct. 2038, 72 L. Ed. 2d 486 (1982); *Commonwealth* v. *Rekasie*, 566 Pa. 85, 98–99, 778 A.2d 624 (2001); *State* v. *Ahmadjian*, 438 A.2d 1070, 1081–82 (R.I. 1981); *State* v. *Andrews*, 324 S.C. 516, 520, 479 S.E.2d 808 (App. 1996); *State* v. *Corliss*, 123 Wn. 2d 656, 663–64, 870 P.2d 317 (1994); *Blackburn* v. *State*, 170 W. Va. 96, 105, 290 S.E.2d 22 (1982); see also *Commonwealth* v. *Eason*, 427 Mass. 595, 600, 694 N.E.2d 1264 (1998) (no violation to eavesdrop on telephone conversation with one party's consent); *State* v. *Wetter*, 190

Vt. 476, 483, 35 A.3d 962 (2011) (same). Although *Eason* and *Wetter* involved situations in which police eavesdropped on, rather than recorded, telephone conversations, we find these cases equally persuasive, and, indeed, at oral argument before this court, counsel for the defendant agreed that a defendant's expectation of privacy is the same regardless of whether the police merely overhear, but do not record, a telephone conversation. Furthermore, because the defendant relies on cases involving the police recording of in person conversations, we also note that multiple other courts, using the reasoning in *White*, have not found those situations where the police fit an informant with a body wire to overhear the contents of such a conversation to be unconstitutional. See, e.g., *Smithey* v. *State*, 269 Ark. 538, 544, 602 S.W.2d 676 (1980); *Lawhorn* v. *State*, 452 N.E.2d 915, 918–19 (Ind. 1983); *Lee* v. *State*, 489 So. 2d 1382, 1386 (Miss. 1986); *State* v. *Engleman*, 634 S.W.2d 466, 477 (Mo. 1982); *State* v. *Kilgus*, 128 N.H. 577, 591, 519 A.2d 231 (1986); *People* v. *McGee*, 49 N.Y.2d 48, 61, 399 N.E.2d 1177, 424 N.Y.S.2d 157 (1979) (Meyer, J., concurring), cert. denied sub nom. *Waters* v. *New York*, 446 U.S. 942, 100 S. Ct. 2166, 2167, 64 L. Ed. 2d 797 (1980); *State* v. *Levan*, 326 N.C. 155, 172, 388 S.E.2d 429 (1990); *State* v. *Loh*, 780 N.W.2d 719, 724 (N.D. 2010); *State* v. *Sanders*, 452 S.W.3d 300, 315 (Tenn. 2014); *State* v. *Boone*, 581 P.2d 571, 573 (Utah 1978); *Almada* v. *State*, 994 P.2d 299, 311 (Wyo. 1999).

[11] Although the defendant contends that "[o]ver a dozen state [s]upreme [c]ourts have rejected the [third-party consent] doctrine" under their state constitutions, in support of that proposition, she cites to a law review article that examined the third-party consent doctrine more broadly. See O. Kerr, "The Case for the Third-Party Doctrine," 107 Mich. L. Rev. 561, 564 (2009); id., 564 n.11, citing S. Henderson, "Learning from All Fifty States: How To Apply the Fourth Amendment and Its State Analogs To Protect Third Party Information from Unreasonable Search," 55 Cath. U. L. Rev. 373 (2006). Henderson's article notes that several states have held various police actions unconstitutional, including, inter alia, the installation of a pen register, the search of garbage left for collection, and the search of bank records. S. Henderson, supra, 396–405. We are not persuaded that decisions of our sister states addressing these different factual circumstances should alter our analysis in the present case.

[12] See also *State* v. *Glass*, supra, 583 P.2d 881 n.35 ("[w]e have previously recognized the high degree of protection surrounding the home"); *Commonwealth* v. *Blood*, supra, 400 Mass. 70 ("it is objectively reasonable to expect that conversational interchange *in a private home* will not be invaded surreptitiously by warrantless electronic transmission or recording" [emphasis added]); *State* v. *Blow*, supra, 157 Vt. 518 (one "deeply-rooted legal and societal principle [is] that the coveted privacy of the home should be especially protected"); *State* v. *Mullens*, supra, 221 W. Va. 90 ("[A]ctivities which take place within the sanctity of the home merit the most exacting [constitutional] protection. . . . For this reason, the jurisprudence of this [c]ourt . . . has drawn a firm line at the entrance to the house." [Citations omitted; internal quotation marks omitted.]); but see *State* v. *Goetz*, supra, 345 Mont. 433 (impermissible under state constitutional provision protecting right to privacy to record conversations occurring in home and vehicle).

[13] We also note that, in *Mullens*, the Supreme Court of Appeals of West Virginia explicitly limited its holding to those cases in which the police send an informant into a defendant's home to record communications therein. *State* v. *Mullens*, supra, 221 W. Va. 91. That court had earlier concluded that the warrantless electronic recording of a defendant's *telephone* conversation with the consent of a participant of the conversation did not violate the state constitution. *Blackburn* v. *State*, 170 W. Va. 96, 105, 290 S.E.2d 22 (1982).

[14] We note that the defendant does not argue that § 52-570d (a) was in fact violated when her calls with Becker were recorded. While we need not decide that issue in the present case, it may well be that the recordings in this case fall within the exception for recording a conversation "which conveys threats of extortion . . . or other unlawful requests or demands," as the state claims, or another exception to the statute. To the extent that the conduct at issue in this case would satisfy one of the statutory exceptions, the defendant certainly could not claim that she had a reasonable expectation of privacy in her conversations with Becker on the basis of this statute alone.

[15] The defendant also relies on statutes from multiple other states which prohibit, in certain circumstances, recording telephone conversations. We are not persuaded that those statutes should alter our analysis because, first, they do not represent Connecticut public policy, and, second, those statutes do not all support the defendant's contention that there is such a

broad policy against recording private conversations. Notably, many of the statutes on which the defendant relies simply adopt the *Katz* reasonable expectation of privacy test; see, e.g., *Flanagan* v. *Flanagan*, 27 Cal. 4th 766, 777, 41 P.3d 575, 117 Cal. Rptr. 2d 574 (2002) (statute prohibiting recording of confidential communications absent consent of all parties only applies where one "has an objectively reasonable expectation that the conversation is not being overheard or recorded"); or contain multiple exceptions to the prohibition on recording conversations with only one party's consent. See, e.g., Wn. Rev. Code § 9.73.030 (2) (2014) (permissible to record, with one party's consent, telephone conversations "[a] of an emergency nature . . . [b] which convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands . . . [c] which occur anonymously or repeatedly or at an extremely inconvenient hour, or [d] which relate to communications by a hostage holder or barricaded person").

[16] We note that the state does not argue that the defendant waived this claim. Indeed, the United States Supreme Court has explained that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Pate* v. *Robinson*, supra, 383 U.S. 384. The court has also noted, however, that "judges must depend to some extent on counsel to bring issues into focus," and that an inartfully drawn motion for continuance may not provide the appropriate assistance to the trial court in determining whether an inquiry into the defendant's competence is necessary. *Drope* v. *Missouri*, 420 U.S. 162, 176–77, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). Thus, although defense counsel's disclaimer of any competency issues would not preclude review of a claim that the trial court abused its discretion by failing to conduct an independent inquiry on that matter, such assertions would be relevant to deciding the merits of that issue.

[17] The defendant also relies on defense counsel's allegations that the defendant was confined to a wheelchair, had to wear a neck brace, that her hand was twitching at times after she discontinued certain medications in an effort to avoid drowsiness, and that she "look[ed] unhealthy." Because these allegations in no way relate to the defendant's competence, they merit no response.

[18] The defendant, somewhat contradictorily, asserts that defense counsel requested a competency evaluation pursuant to § 54-56d but "did not specifically demand that the trial court conduct a *Pate* inquiry." Because § 54-56d codifies the due process standard required by *Pate* v. *Robinson*, supra, 383 U.S. 378, the request for one is a request for the other. See *State* v. *Ross*, 269 Conn. 213, 270–71, 849 A.2d 648 (2004). In any event, the defendant's assertion that defense counsel requested a § 54-56d evaluation is a gross misrepresentation of the record. Although the record reflects that defense counsel for *John Skok* requested a competency evaluation, the record is absent of any indication that one was requested for the defendant. Rather, counsel for the defendant repeatedly eschewed the notion that the defendant needed such an evaluation.